# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1884

_____

Charleston Housing Authority, a          *
municipal corporation,                   *
                                         *
            Plaintiff - Appellant,       *
                                         *  Appeals from the United States
      v.                                 *  District Court for the Eastern
                                         *  District of Missouri.
United States Department of              *
Agriculture; Ann M. Veneman, in her      *
official capacity as Secretary of the    *
United States Department of              *
Agriculture,                             *
                                         *
            Defendants - Appellees,       *
                                         *
Frances Hines, Timothy Owens, Priscilla  *
Johnson, Essie McCatrey, Danny Hines,    *
Tisha Smith, Yolanda Clark, Housing      *
Comes First, a Missouri non-profit       *
corporation,                             *
                                         *
            Movants Below.                *


_____

No. 04-2620

_____

Frances Hines,                           *
                                         *
            Plaintiff,                    *

|  |  |
|---|---|
|  | * |
| Timothy Owens, Priscilla Johnson, Essie McCatrey, | * |
|  | * |
|  | * |
| Plaintiffs - Appellees, | * |
|  | * |
| Danny Hines, | * |
|  | * |
| Plaintiff, | * |
|  | * |
| Housing Comes First, a Missouri non-profit corporation, | * |
|  | * |
|  | * |
| Plaintiff - Appellee | * |
|  | * |
| Angela Moore, Tisha Smith, Yolanda Clark, | * |
|  | * |
|  | * |
| Plaintiffs, | * |
|  | * |
| v. | * |
|  | * |
| Charleston Housing Authority, a municipal corporation, Paul Page, in his official capacity and as Executive Director of the Charleston Housing Authority, | * |
|  | * |
|  | * |
|  | * |
|  | * |
|  | * |
| Defendants - Appellants, | * |
|  | * |
| Department of Housing and Urban Development, Mel Martinez, in his official capacity and as Secretary of the United States Department of Housing and Urban Development, United States Department of Agriculture, Ann M. Veneman, in her official capacity as Secretary of the United States Department of Agriculture, | * |
|  | * |
|  | * |
|  | * |
|  | * |
|  | * |
|  | * |
|  | * |
|  | * |
|  | * |

_____

Submitted:  April 11, 2005
Filed: August 18, 2005 (Corrected 8/30/05)

_____

Before MURPHY, BRIGHT, and MELLOY, Circuit Judges

_____

MELLOY, Circuit Judge.

In 2001, a local housing authority in Charleston, Missouri, the Charleston Housing Authority (the "Housing Authority"), sought to implement a revitalization plan that involved the demolition of selected public housing units.  The housing units at issue were the Charleston Apartments, fifty low-income rental units in a cluster of twenty-two separate buildings.  At the time that the Housing Authority adopted its plan, forty-seven of the fifty units were occupied, forty-six by African American tenants.

The Housing Authority had purchased and updated the Charleston Apartments in 1981 with the help of a $740,000 Farmer's Home Administration ("FmHA") Section 515 Rural Rental Housing loan under the National Housing Act of 1949, as amended by Pub. L. No. 89-754, Section 804, 80 Stat. 1255, 1282 (1966), codified at 42 U.S.C. § 1485.  Under the terms of the loan agreement, the Housing Authority was required to use the Charleston Apartments as public housing.  Also in 1981, the Housing Authority had signed a twenty-year contract with the Department of Housing and Urban Development ("HUD") to receive Section 8, project-based assistance under the Housing Assistance Program.  See 42 U.S.C. § 1437.  The Section 8 contract, like the Section 515 loan agreement, required the Housing Authority to operate the property as low-income public housing.

-3-

In 2001, the Housing Authority elected not to renew its Section 8 Housing Assistance Program contract. Also, the Housing Authority attempted to tender final payment on the Section 515 loan to eliminate the Section 515 contractual restrictions on use of the Charleston Apartments. The United States Department of Agriculture ("USDA")[1] refused to accept the payment. The USDA characterized the payment as a "prepayment" as that term is defined under the Emergency Low Income Housing Preservation Act, codified at 42 U.S.C. § 1472(c) ("Preservation Act"). As discussed below, the Preservation Act is a statute designed to protect the nation's stock of public housing by requiring, inter alia, that units be offered for sale to qualifying organizations or governmental bodies for continued use as public housing when an owner proposes to prepay a loan and terminate use of the units for public housing.[2]

The Housing Authority disputed the USDA's characterization of the tendered payment as a prepayment, arguing that the payment was a regularly scheduled payment. The Housing Authority also challenged the enforceability of the Preservation Act. The Housing Authority sought a court order to quiet title and to force the USDA to accept the payment and release the subject units from statutory and contractual restrictions on use. Ruling on a motion for summary judgment, the district court determined that the tendered payment was a prepayment, the Preservation Act applied, and the Preservation Act precluded the USDA's acceptance. Accordingly, the district court refused to enter the Housing Authority's requested order. The Housing Authority appeals these rulings.

---

[1]Although the Housing Authority borrowed the $740,000 from the FmHA, subsequent agency reorganization placed the USDA in the position of administrator of the loan.

[2]For a thorough history of the loan programs at issue in this case and the legislation and regulations that set forth the protocol for USDA acceptance of prepayment, see Franconia Assoc. v. United States, 61 Fed. Cl. 718, 722-25 (2004) (on remand following Franconia Assoc. v. United States, 536 U.S. 129, 134-38 (2002)).

-4-

In addition, current and former residents of the Charleston Apartments and a non-profit organization, Housing Comes First, brought a separate action against the Housing Authority. These plaintiffs sought injunctive relief to prevent the Housing Authority from implementing its revitalization plan. These plaintiffs alleged that implementation of the plan would create a disparate impact on the basis of race. The district court held a bench trial, ruled in favor of these plaintiffs on two claims, enjoined implementation of the plan, and ordered the Housing Authority to lease vacant and vacated Charleston Apartment units to eligible applicants. The Housing Authority appeals these rulings.

We affirm in all respects other than the scope of the injunctive relief. On this limited issue, we remand for the reasons discussed below.

I. Background

Under the terms of the promissory note, the Housing Authority was to make 588 monthly payments of $5,624.00, with the final payment due in 2031. The loan documents permitted the Housing Authority to make prepayments on the loan. The loan documents also required the Housing Authority to comply with all applicable laws and regulations in effect when the parties entered the agreement as well as any subsequent laws and regulations not inconsistent with then-existing laws and regulations.

The Housing Authority, in fact, made substantial prepayments on the loan. The Housing Authority did not need all of the $740,000 it initially borrowed to purchase and repair the Charleston Apartments. As a result, the Housing Authority returned almost $130,000 of principal during 1981. Also, between 1981 and 2000, the Housing Authority made other prepayments, including $6,000 monthly payments rather than the lesser amount that was actually due. Consequently, as of July 1999, the outstanding balance was less than $50,000.

In July 1999, the Housing Authority contacted the USDA regarding payment of the outstanding balance of the loan. The USDA responded by sending the Housing Authority instructions that explained prepayment procedures under the Preservation Act. In general terms, these procedures require an owner to provide information to enable an assessment of whether prepayment would adversely impact minorities or leave displaced tenants without adequate, safe housing. 42 U.S.C. § 1472(c)(5)(G). If an adverse impact is expected, statutory "safe harbor" provisions do not apply, and the USDA is required to negotiate with the owner to retain the units as public housing. Id. at § 1472 (c)(4)(A). If no agreement is reached, the owner must offer the units for sale at fair market value to certain qualifying parties for continued operation as public housing. Id. at § 1472(c)(5)(A)(i). If no qualifying buyer purchases the property, the USDA may then accept prepayment and release the property from use restrictions. Id. at § 1472(c)(5)(A)(ii). The Preservation Act provides that the fair market value is a price determined by party-designated appraisers. Id. at § 1472(c)(5)(A)(i).

Congress passed the Preservation Act as a response to a perceived crisis in the loss of public housing due to the prepayment of Section 515 loans. Parkridge Investors, L.P. v. Farmers Home Admin., 13 F.3d 1192, 1195 (8th Cir. 1994). The protocol for the acceptance of prepayments and the retention of public housing did not exist when the Housing Authority entered the agreement with the FmHA. The parties agree that, but for the Preservation Act, the contract grants the Housing Authority an unconditional right to prepay the loan. Accordingly, the prepayment protocol demanded by the USDA is in direct conflict with the Section 515 loan agreement's prepayment provisions.

In November 1999, the Housing Authority adopted a de-concentration policy, and in December 1999, decided not to rent units at the Charleston Apartments as they became vacant. In February 2000, the Housing Authority adopted Resolution 604 in which it resolved not to seek renewal of the Section 8 contract. Through Resolution

604, the Housing Authority also resolved to pay off the loan and demolish the Charleston Apartments.

In April 2000, the Housing Authority notified HUD of the decision not to renew the Section 8 agreement, effective April 2001. As of April 2000, the amount of principal on the Section 515 loan had been reduced to about $112. Accordingly, payment of an amount substantially less than a regularly scheduled installment payment would have paid the loan in full.

In December 2000, the Housing Authority submitted a prepayment request to the USDA, in compliance with the Preservation Act instructions that the USDA had sent in July 1999. In April 2001, HUD offered to extend the Section 8 contract for four months. Also in April 2001,the USDA responded to the Housing Authority's prepayment request by asking for additional information. The Housing Authority did not provide the additional information, but rather, in May 2001, tendered a check to the USDA which would have paid the loan in full. The USDA returned the check the next day. About one week later, the USDA sent a letter to the Housing Authority demanding that the Housing Authority continue to operate the Charleston Apartments in accordance with the loan documents and applicable regulations until the USDA completed its impact determination as required under the Preservation Act prepayment approval process. At the end of May, the Housing Authority refused to sign a Section 8 contract extension with HUD. Also at the end of May, the Housing Authority tendered payment for a second time. The USDA again returned the check.

On June 11, 2001, the Housing Authority adopted Resolution 639 which rescinded Resolution 604 (regarding demolition of the Charleston Apartments). On June 22, the USDA informed the Housing Authority that it had determined prepayment of the loan would have an impact on minorities such that the Housing Authority would have to advertise the Charleston Apartments for sale to an eligible non-profit organization or public body. The USDA informed the Housing Authority

of its right to appeal the impact determination. The Housing Authority did not appeal the impact determination, but rather, on June 27, notified the USDA that it was withdrawing "what it erroneously termed a request to prepay." As of the date of the district court's opinion, there was no pending request for prepayment.

## II. Procedural History

In late June 2001, the Housing Authority brought a Complaint for Declaratory Judgment seeking to have the promissory note marked paid and a deed of trust released. The Housing Authority later added a request to obtain quiet title. We refer to this complaint and the claims therein as the Housing Authority's Complaint and the Housing Authority's Claims.

Housing Comes First, the two remaining Charleston Apartment tenants, and certain former tenants filed a separate, multi-count action against the Housing Authority, HUD, and the USDA. We refer to these plaintiffs collectively as the Tenants and their complaint and the claims therein as the Tenants' Complaint and the Tenants' Claims.

Relevant to this appeal are summary judgment rulings on the Housing Authority's Claims and trial rulings on the Tenants' Claims. The Housing Authority and the Tenants filed cross motions for summary judgment on the Housing Authority's Claims against the USDA. The USDA did not file its own motion for summary judgment, but asked in its response to the Housing Authority's motion that the district court grant summary judgment against the Housing Authority. The district court questioned the Tenants' ability to seek summary judgment on the USDA's behalf. Accordingly, the district court treated the request in the USDA's responsive filing as a motion for summary judgment and treated the Tenants' arguments as supplemental arguments by the USDA. The district court then determined that the Preservation Act applied, the final payment on the loan was a prepayment under

Preservation Act, and the USDA was not able to accept the prepayment unless the Housing Authority first followed the protocol for preservation of public housing as set forth in Preservation Act. The district court granted summary judgment against the Housing Authority on all of the Housing Authority's Claims.

The district court disposed of Counts I and II of the Tenants' Complaint via summary judgment in favor of the Housing Authority. The district court then held a bench trial on Counts III-XIII of the Tenants' Complaint and entered judgment against the Tenants as to Counts III-VIII and XII-XIII. The Tenants' do not appeal these rulings. The district court entered judgment against HUD as to Count XI, and HUD has not appealed that ruling.

The only counts from the Tenants' Complaint relevant to the present appeals are Counts IX and X against the Housing Authority. Count IX is a claim under the Quality Housing and Work Responsibility Act of 1998, 42 U.S.C. § 1437c-1(d)(15), in which the Tenants allege that the Housing Authority failed to affirmatively further fair housing in relation to its refusal to rent and planned demolition of the Charleston Apartments. Count X is a claim under the Fair Housing Act, 42 U.S.C. § 3604(a), in which the Tenants allege disparate impact discrimination based on race. The district court found in favor of the Tenants as to the disparate impact claim, finding a disparate impact and also finding that the Housing Authority proffered only pretextual explanations for its actions. The district court then found, as to Count IX, that there was an absence of evidence to show that the Housing Authority had considered the impact of its planned action upon African-Americans. The district court concluded that this absence of evidence, coupled with the disparate impact violation of the Fair Housing Act, demonstrated that the Housing Authority had failed

to affirmatively further fair housing.[3]  Consequently, the district court entered judgment against the Housing Authority as to Counts IX and X.

Following the bench trial, the district court ordered the Housing Authority not to discriminate on the basis of race.  The district court declined, however, to order the Housing Authority to "rent-up" the Charleston Apartments.  The district court found instead that because the Preservation Act applied, the Housing Authority would have to comply with Preservation Act's protocol for the retention of public housing before the Charleston Apartments could be demolished or used for purposes other than public housing.  Accordingly, the district court ordered the USDA to refuse to accept payment and to refuse to remove restrictions on use unless and until the Housing Authority complied with the multi-step protocol of the Preservation Act.

The Tenants then filed a motion asking the district court to reconsider the form of relief.  In ruling on the motion to reconsider, the district court determined that its initial relief was inadequate.  Consequently, the district court ordered the Housing Authority to reopen the Charleston Apartments and give priority to former residents who wished to return. The district court did not specify that complete occupancy was required nor that the Housing Authority had to achieve a certain percentage of occupancy.

---

[3]The district court noted that the Housing Authority had not raised the issue of whether the duty to affirmatively further fair housing as set forth in the Quality Housing and Work Responsibility Act was privately enforceable.  Because the Housing Authority did not raise this issue, and because the question of whether a statute creates a private right of action is not a question of subject matter jurisdiction, we need not determine whether such a right exists.  See MM&S Financial, Inc. v. National Ass'n of Securities Dealers, Inc., 364 F.3d 908, 909-10 (8th Cir. 2004) (analyzing whether a statute created a private enforcement right under Fed. R. Civ. P. 12(b)(6)).

On appeal, the Housing Authority presents a series of arguments in support of its theory that the terms of the agreement rather than the requirements of the Preservation Act control on the present facts and that the USDA must unconditionally accept the tendered payment. The Housing Authority also argues that the Tenants failed to demonstrate an adverse impact, and that even if the Tenants had demonstrated an adverse impact, the Housing Authority's proffered rationale for the proposed action was legitimate and non-pretextual. The Housing Authority also argues that its recision of Resolution 604 makes the present discrimination claims moot. Finally, the Housing Authority challenges the district court's remedy, namely, the forced occupancy of the Charleston Apartments.

## III. Discussion – Housing Authority's Claims

We review a grant of summary judgment de novo. Summary judgment is particularly appropriate where the dispute revolves around arguments that are purely legal and where there are no disputes of material fact. Here, the facts surrounding loan payments and performance under the Section 515 agreement are undisputed. The dispute concerns only the impact of subsequent legislation, the Preservation Act, upon a previously established contract.

The Housing Authority and the FmHA entered into the Section 515 agreement in 1981. Like the Supreme Court in Franconia Assoc. v. United States, 536 U.S. 129 (2002), and our court in Parkridge Investors, L.P. v. Farmers Home Admin., 13 F.3d 1192 (8th Cir. 1994), we assume that the loan agreement granted the Housing Authority an unconditional right to prepay the loan and imposed on the USDA a concomitant obligation to accept prepayment.

Congress passed the Preservation Act in 1987. The prepayment protocol of the Preservation Act is in direct conflict with the Housing Authority's 1981 contractual right of prepayment. The Housing Authority argues that the contractual provisions

prevail over the subsequent legislation because: (1) the government clearly waived its right to pass legislation such as the Preservation Act when it entered into the 1981 agreement such that the Preservation Act is unenforceable against the Housing Authority; (2) the final payment is not a prepayment under the Preservation Act; and (3) the USDA is equitably estopped from refusing acceptance in light of its course of performance under the contract which included the ongoing acceptance of prepayments. We address these arguments in turn.

We reject the first argument based on Parkridge Investors. As explained by the district court below, our court in Parkridge Investors:

> interpreted a loan agreement identical to the one at issue in this case and held that the government did not contract away its sovereign power to alter the loan agreement through subsequent legislation merely by agreeing to an absolute prepayment right. [We] further held that the government did not effectuate a taking or otherwise unconstitutionally alter the terms of a loan agreement by requiring the borrower to comply with the provisions of the [Preservation Act].

In Parkridge Investors, our court analyzed the enforceability of the Preservation Act as applied to a Section 515 contract under the standard set forth in Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 147 (1982). "In Merrion, the Supreme Court observed that 'sovereign power . . . is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms.'" Parkridge Investors, 13 F.3d at 1198 (quoting Merrion, 455 U.S. at 148). Our court concluded, "The United States cannot be said to have unmistakeably waived one of its most vital powers, that of enacting legislation, by virtue of this contract language." Id. The district court correctly recognized that Parkridge Investors, involving the same law applied to a Section 515 agreement, controls on the present facts.

The Housing Authority's second argument, that the tendered payment was not a prepayment, also fails. This technical argument is contrary to the goals of the Preservation Act and contrary to the Preservation Act's implementing regulations. As already noted, Congress passed the Preservation Act to prevent exactly the activity that the Housing Authority proposed in this case, namely, the removal of public housing units through the retirement of Section 515 loans and the elimination of accompanying restrictions on use. The applicable regulations at 7 C.F.R. § 1965.224 (2002)[4] provide that a final payment accelerated from the original maturity date due to earlier prepayments or refunds from the borrower is to be treated as a prepayment. Id. ("If the loan on a project . . . reaches or falls below six remaining payments *due to borrower voluntary advance payments* . . . the borrower will be notified that the final payment on the account cannot be accepted unless a pre-payment request is made."). Further, the regulations define "prepayment" as payment before the loan maturity date. 7 C.F.R. § 1964.202 (2002).

The original maturity date for the loan was 2031. The Housing Authority's prepayments did not alter the maturity date. Through the initial refund of almost $130,000, the Housing Authority prepaid a substantial portion of principal. Also, each additional payment included prepayments on principal. Permitting a Section 515 debtor who has made substantial prepayments to label a final payment thirty years prior to the original maturity date as anything other than a prepayment would be to elevate technical form over substance. To hold otherwise would create a

---

[4]The Department of Agriculture recently reorganized some of its regulations, including those relevant to rural housing, Section 515 loans, and prepayment requests. See Reinvention of the Sections 514, 515, 516, and 521 Multi-Family Housing Programs, 69 FR 69032 (Interim final rule, Nov. 26, 2004, effective in relevant part on February 24, 2005). Section 1964.224 does not appear in the renumbered and amended regulations now codified under 7 C.F.R. § 3560. The definition of prepayment remains effectively unchanged. See 7 C.F.R. § 3560.11.

loophole in the Preservation Act's prepayment restrictions large enough swallow all of Congress's clearly expressed intent.[5]

The Housing Authority's final argument, that equitable estoppel applies based on the USDA's past acceptance of prepayments, also fails. To succeed on a claim of equitable estoppel against the government, a plaintiff must not only prove all the elements of equitable estoppel, but also that the government committed affirmative misconduct. See Rutten v. United States, 299 F.3d 993, 995 (8th Cir. 2002) ("In addition to proving the traditional elements of estoppel, the plaintiff must first establish that the government committed affirmative misconduct."). The Housing Authority made no such showing in the present case. Because the district court correctly rejected all of the Housing Authority's arguments against application of the Preservation Act, summary judgment was appropriate and we affirm.[6]

---

[5]The issue presented in this case is limited. The Housing Authority seeks specific performance of the contract's prepayment provisions–in effect, a court order forcing the USDA to violate the Preservation Act. Although we may not grant the requested relief, the Housing Authority is not necessarily without a remedy. The Supreme Court in Franconia Assoc., 536 U.S. at 142-144, addressed the impact of the Preservation Act upon a Section 515 contract. To resolve a question regarding the applicable statute of limitations on a Section 515 debtor's Tucker Act claim, the Court stated that passage of the Preservation Act comprised a repudiation of the contract and the government's refusal to accept prepayment comprised breach. Although the Court addressed only a statute of limitations issue, the Court's reasoning strongly suggests that damages may be available under the Tucker Act for some Section 515 debtors.

[6]Like the district court, we note that the Housing Authority in this case sought only equitable relief and did not seek damages as may be available under the Tucker Act, 28 U.S.C. § 1491. See Franconia Assoc's v. United States, 536 U.S. 129 (2002) (addressing a statute of limitations issue surrounding a Tucker Act claim by a Section 515 borrower based on alleged breach of a Section 515 contract related to application of the Preservation Act).

IV.  Discussion – Disparate Impact Discrimination and the Quality Housing and Work Responsibility Act

Following a bench trial, "we review the trial court's findings of fact for clear error." Cooper Tire & Rubber Co. v. St. Paul Fire & Marine Ins. Co., et al., 48 F.3d 365, 369 (8th Cir. 1995); see also Fed. R. Civ. Pro. 52(a).  The district court's determinations under the disparate impact burden-shifting analysis are factual determinations that we review for clear error.  See Chambers v. Omaha Girls Club, Inc., 834 F.2d 697 (8th Cir. 1987) (stating in the context of a disparate impact employment discrimination claim that determinations under the burden shifting analysis "are reviewed under the clearly erroneous standard of review applied to factual findings").  Questions of mootness are matters of subject matter jurisdiction that we review de novo.

We first address the Housing Authority's mootness argument.  The Housing Authority argues that because it rescinded Resolution 604 when it passed Resolution 639, there is no longer a pending plan to demolish the Charleston Apartments.  The Housing Authority also claims that it is considering a plan proposed by a group of citizens to demolish only nine of the Charleston Apartment fourplex units and replace those units with low-income, for-sale units.  Notwithstanding these claims, the record demonstrates that the Housing Authority has continued its practice of leaving the Charleston Apartments vacant, as per Resolution 604.  Further, the Housing Authority continues to seek reversal of the district court's ruling under the Preservation Act.

Defendants who argue mootness due to changed circumstances based on their own behavior face a heavy burden.  This is because, in general, "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc., 528 U.S. 167, 189 (2000) ("A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could

-15-

not reasonably be expected to recur."). We think it is clear that the Housing Authority has not demonstrated mootness in this instance. Instead, the present case fits the well-established exception for situations that are capable of being repeated, yet escape review. Id.

Here, the Housing Authority's continued attempts to obtain quiet title belie its claim that it no longer intends to convert the property to other uses. Further, the timing of Resolution 639 and the withdrawal of the request for prepayment were such that they appear more akin to strategic, litigation-related acts rather than elements of long-range planning. Accordingly, it is reasonable to expect that the discrimination claim plaintiffs will be subject to the same action in the future, even if under a slightly different plan. The possibility of this recurrence is not so remote or speculative that our jurisdiction is lacking. See, e.g., Van Bergen v. Minnesota, 59 F.3d 1541, 1547 (8th Cir. 1995).[7]

Turning to the merits of Counts IX and X of the Tenants' complaint, we find no arguments specific to Count IX, the Quality Housing and Work Responsibility Act claim. Consequently, we assume that the Housing Authority accepts the district court's reasoning—the absence of evidence to demonstrate consideration of an impact upon African Americans means that an adverse ruling on the disparate impact discrimination claim also resolves the Quality Housing and Work Responsibility Act, "affirmatively further fair housing" claim.[8] Accordingly, we address in detail only Count X, the Fair Housing Act claim.

---

[7]To the extent that the particular facts surrounding any proposed, alternative plan or options for revitalization of the area deviate from the original plan, such details are best addressed by the district court upon reconsideration of the scope of its injunctive relief. Limiting our examination only to the issue of mootness, we find the likelihood of recurrence sufficiently certain to vest jurisdiction in our court.

[8]Again, we note that the Housing Authority did not challenge the Tenants' ability to privately enforce this provision against a municipal housing authority.

To establish a prima facie, Fair Housing Act, disparate impact claim under Oti Kaga, Inc. v. South Dakota Housing Dev. Auth., 342 F.3d 871, 883 (8th Cir. 2003), the plaintiffs must demonstrate that the objected-to action results in, or can be predicted to result in, a disparate impact upon a protected class compared to a relevant population as a whole. Id. (stating that plaintiffs "must show a facially neutral policy has a significant adverse impact on members of a protected minority group"). The Tenants made this showing. The Housing Authority argues on appeal that the Tenants' disparate impact claims fail because they did not offer evidence of purposeful discrimination and did not demonstrate that similarly situated non-members of the class were subject to disparate treatment. The Tenants, however, did not allege disparate treatment, they alleged disparate impact. Under United States v. City of Black Jack, 508 F.2d 1179, 1184 (8th Cir. 1974), the Tenants "need prove no more than that the conduct of the defendant actually or predictably results in discrimination; in other words, that it has a discriminatory effect."

The Housing Authority also attacks the Tenants' statistical proof as to disparate impact. In doing so, the Housing Authority discusses the goal of reducing the density of low income housing. This issue, however, is more appropriately considered under the subsequent steps of the disparate impact claim burden shifting analysis. Focusing only on arguments material to the Tenants' prima facie case, we believe that the Housing Authority has failed to demonstrate clear error. The Tenant's proof established a disproportionate impact upon minority class members whether we examine the relevant waiting list population, the income-eligible population, or the actual Charleston Apartment Tenants. The district court did not clearly err in finding that the Tenants established a prima facie case.

Under the second step of the disparate impact burden shifting analysis, the Housing Authority must demonstrate that the proposed action has a "manifest relationship" to the legitimate non-discriminatory policy objectives and "is justifiable on the ground it is necessary to" the attainment of these objectives. Oti Kaga, 342

F.3d at 883. Here, the Housing Authority sought to justify its actions based upon a need for low income housing density reduction, a need to eliminate a housing design that contributed to a concentration of criminal activity and drug use, and a lack of funding to make improvements.

The district court determined as a matter of fact that these justifications were pretextual because they were unsupported by evidence. Regarding low-income population density, the district court found that the Housing Authority had mischaracterized the density by overstating the number of low-income rental units contained within the area under examination. Regarding crime and drug abuse at the Charleston Apartments, the district court stated:

> The evidence showed that the Housing Authority has had a one strike policy for a number of years, that it has the right to evict and/or refuse to rent to people involved in criminal activity, and that it can ban people it considers troublemakers. [The Housing Authority] has rigorously enforced these measures. [The Housing Authority] has also benefitted from various crime reduction programs such as weed and seed and community policing. The evidence showed that [the Housing Authority] had taken numerous effective measures to control crime and drug trafficking in the Charleston Apartments. The statistical evidence did not support [the Housing Authority's] assertion that crime was a particular problem at the apartments.

Regarding funding, the district court noted that the Housing Authority's records demonstrated that the Charleston Apartments were financially stable, the Housing Authority had multiple sources of untapped funding, and the Housing Authority's ability and election to pay down the loan belied its claim of severe financial constraints.

On appeal, the Housing Authority offers little evidence to attack these findings. It does not address the issues of crime and drug use. Regarding low income

concentration, the Housing Authority argues that the district court failed to recognize density reduction as a legitimate and Congressionally recognized goal. The Housing Authority is correct that, in the abstract, a reduction in the concentration of low income housing is a legitimate goal that has been recognized by Congress. See, e.g., 42 U.S.C. § 1437p(d) (implementing the goal of reducing the concentration of low-income public housing by providing that replacement housing is permitted on-site following the demolition of obsolete housing "*if* the number of replacement public housing units is significantly fewer than the number of units demolished") (emphasis added); id. at § 1437v (calling for "housing that will avoid or decrease the concentration of very low-income families"). However, the Housing Authority mischaracterizes the district court's decision. The district court did not critique the general goal of deconcentration. Rather, the district court found that the Housing Authority had not shown a need for deconcentration in this instance, and in fact, had falsely represented the density at the location in question in an attempt to do so. These findings were not clearly erroneous.

Finally, the Housing Authority presents a general attack upon the district court's disparate impact decision, calling it impermissible interference by the judicial branch in a legitimate, legislative, decision-making process carried out by the Housing Authority. General separation of powers arguments such as this, presented in the context of disparate impact claims, are misplaced. They ignore the fact that the burden-shifting analysis and the judicial scrutiny commensurate in scope with the rights alleged to have been infringed drove the creation of the burden shifting framework and define the deference owed to legislative decisionmakers. However, even if we were to find it appropriate to address this general argument outside the scope of the burden-shifting analysis, the argument is without merit on the present facts. Our treatment of the claims related to the loan agreement and the Preservation

-19-

Act demonstrate that the proposed action in this case was not, in fact, a legitimate legislative action.

We affirm the district court as to Counts IX and X the Tenants' Complaint.

VI. Injunctive Relief.

In sum, we affirm all of the district court decision, with the exception that we believe that the Housing Authority, as well as the tenants, should be given an opportunity to present additional evidence as to the appropriate relief to be granted in this case. We do not imply that the district court should not reimpose the same injunction that was previously granted. However, it is an unfortunate fact of litigation that the passage of time can often materially change circumstances that may have existed at the time the original relief was granted. This may be such a case.

On remand, the district court may accept evidence of current conditions at the apartments and evidence regarding proposals for redevelopment. Further, alternative proposals for revitalization of the Charleston Apartments may present opportunities that will affirmatively further fair housing in a more positive fashion than reoccupancy of the existing apartments. Accordingly, we remand to the district court for reconsideration of its order of injunctive relief.

We affirm in part and remand for further proceedings consistent with this opinion.

_____