FRANCONIA ASSOCIATES ET AL. *v.* UNITED STATES

No. 01–455.   Argued April 15, 2002—Decided June 10, 2002*

*Together with *Grass Valley Terrace et al.* v. *United States* (see this Court's Rule 12.4), also on certiorari to the same court.

130

GINSBURG, J., delivered the opinion for a unanimous Court.

*Jeff H. Eckland* argued the cause for petitioners. With him on the briefs were *William L. Roberts* and *Mark J. Blando.*

*Matthew D. Roberts* argued the cause for the United States. With him on the brief were *Acting Solicitor General Clement, Assistant Attorney General McCallum, James A. Feldman, David M. Cohen,* and *Mark L. Josephs.*†

JUSTICE GINSBURG delivered the opinion of the Court.

The two cases consolidated for our review concern the timeliness of claims filed against the United States under the Tucker Act, 28 U. S. C. § 1491. Petitioners are property owners who participated in a federal program to promote development of affordable rental housing in areas not traditionally served by conventional lenders. In exchange for low-interest mortgage loans issued by the Farmers Home Administration (FmHA), petitioners agreed to devote their

---

†Briefs of *amici curiae* urging reversal were filed for Bank of America, FSB, et al. by *Steven S. Rosenthal, Alan K. Palmer, Leo G. Rydzewski, John C. Millian, Melvin C. Garbow, Howard N. Cayne, David B. Bergman, Michael A. Johnson, Daniel J. Goldberg, William T. Reilly,* and *Stephen M. Forte;* for the Council for Affordable and Rural Housing by *Carl A. S. Coan III;* and for the National Association of Home Builders by *Thomas Jon Ward.*

*John C. Millian, Mark A. Perry,* and *Paul Blankenstein* filed a brief for John K. Castle et al. as *amici curiae.*

properties to low- and middle-income housing and to abide by related restrictions during the life of the loans.

Petitioners allege that the promissory notes governing their loans guaranteed the borrower the right to prepay at any time and thereby gain release from the federal program and the restrictions it places on the use of a participating owner's property. In the suits that yielded the judgments before us, petitioners charged that Congress abridged that release right in the Emergency Low Income Housing Preservation Act of 1987 (ELIHPA or Act), 101 Stat. 1877, as amended, 42 U. S. C. § 1472(c) (1994 ed. and Supp. V). That Act placed permanent restraints upon prepayment of FmHA loans. Petitioners asserted in their complaints that ELIHPA effected both a repudiation of their contracts and a taking of their property in violation of the Fifth Amendment.

The Federal Circuit held petitioners' claims time barred under 28 U. S. C. § 2501, which prescribes that all Tucker Act claims must be filed within six years of the date they "first accrue[d]." In the Federal Circuit's view, passage of ELIHPA constituted an immediate breach of the FmHA loan agreements and therefore triggered the running of the limitations period. Petitioners filed suit not "within six years of," but over nine years after, ELIHPA's enactment. On that account, the Federal Circuit held their claims untimely, and their suits properly dismissed.

Accepting for purposes of this decision that the loan contracts guaranteed the absolute prepayment right petitioners allege, we reverse the Federal Circuit's judgment. ELIHPA's enactment, we conclude, qualified as a repudiation of the parties' bargain, not a present breach of the loan agreements. Accordingly, breach would occur, and the six-year limitations period would commence to run, when a borrower tenders prepayment and the Government then dishonors its obligation to accept the tender and release its control over use of the property that secured the loan.

I

A

Under §§ 515 and 521 of the Housing Act of 1949, 76 Stat. 671, 82 Stat. 551, as amended, 42 U. S. C. §§ 1485, 1490a, the FmHA makes direct loans to private, nonprofit entities to develop or construct rural housing designed to serve the elderly and low- or middle-income individuals and families.[1] Section 515 loans require the borrower, *inter alia*, to execute various loan documents, including a loan agreement, a promissory note, and a real estate mortgage.

Before December 21, 1979, each petitioner entered into a loan agreement with the FmHA under §§ 515 and 521 "to provide rental housing and related facilities for eligible occupants . . . in rural areas." App. to Pet. for Cert. A165. In the loan agreements, each petitioner certified that it was unable to obtain a comparable loan in the commercial market. See *id.*, at A177. The loan agreements contained various provisions designed to ensure that the projects were affordable for people with low incomes. Those provisions included restrictions as to eligible tenants, the rents petitioners could charge, and the rate of return petitioners could realize, as well as requirements regarding the maintenance and financial operations of each project. See *id.*, at A170–A174. Each loan agreement also specified the length of the loan, ordinarily 40 or 50 years.

The promissory notes executed by petitioners required payment of the principal on each mortgage in scheduled installments, plus interest. See *id.*, at A176–A177. The

---

[1] Since 1994, the program has been entrusted to the Rural Housing Service, known between 1994 and 1996 as Rural Housing and Community Development Services. That agency was created by the Secretary of Agriculture under authority provided by the Department of Agriculture Reorganization Act of 1994, 108 Stat. 3219, as amended, 110 Stat. 1128, 1131. See also 7 CFR § 2003.18 (2002) (functional organization of Rural Housing Service). Our references to the FmHA should be understood to include these successor agencies.

notes also contained the prepayment provision curtailed by the legislation involved in the litigation now before us. That provision read: "Prepayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower." *Id.*, at A176. No other provision of the loan documents addressed prepayment.

In 1979, Congress found that many § 515 participants had prepaid their mortgages, thus threatening the continued availability of affordable rural housing. Concerned that "these projects [remain] available to low and moderate income families for the entire original term of the loan," H. R. Rep. No. 96–154, p. 43 (1979), Congress amended the National Housing Act to stem the loss of low-cost rural housing due to prepayments, see Housing and Community Development Amendments of 1979, 93 Stat. 1101. In these 1979 amendments, Congress prohibited the FmHA from accepting prepayment of any loan made before or after the date of enactment unless the owner agreed to maintain the low-income use of the rental housing for a 15-year or 20-year period from the date of the loan. 93 Stat. 1134–1135. That requirement could be avoided if the FmHA determined that there was no longer a need for the low-cost housing. *Id.*, at 1135.

The 1979 amendments applied to all program loans, past, present, and future. In 1980, however, Congress further amended the National Housing Act to eliminate retroactive application of the § 515 prepayment limitations imposed by the 1979 legislation. The Housing and Community Development Act of 1980, 94 Stat. 1614, provided that the prepayment restrictions would apply only to loans entered into after December 21, 1979, the date that amendment was enacted. § 514, 94 Stat. 1671–1672. The 1980 Act also required the Secretary of Agriculture to inform Congress of the repeal's adverse effects, if any, on the availability of low-income housing. *Id.*, at 1672.

By 1987, Congress had again become concerned about the dwindling supply of low- and moderate-income rural housing in the face of increasing prepayments of mortgages under § 515.[2]  A House of Representatives Committee found that owners were "prepay[ing] or . . . refinanc[ing] their FmHA loans, without regard to the low income and elderly tenants in these projects."  H. R. Rep. No. 100–122, p. 53.

Responsive to that concern, Congress passed ELIHPA, which amended the Housing Act of 1949 to impose permanent restrictions upon prepayment of § 515 mortgages entered into before December 21, 1979.  This legislation, enacted on February 5, 1988, provides that before FmHA can accept an offer to prepay such a mortgage,

> "the [FmHA] shall make reasonable efforts to enter into an agreement with the borrower under which the borrower will make a binding commitment to extend the low income use of the assisted housing and related facilities involved for not less than the 20-year period beginning on the date on which the agreement is executed." 42 U. S. C. § 1472(c)(4)(A) (1994 ed.).

The legislation further provides that the FmHA may include incentives in such an agreement, including an increase in the rate of return on investment, reduction of the interest rate on the loan, and an additional loan to the borrower. § 1472(c)(4)(B) (1994 ed. and Supp. V).

Under ELIHPA, if the FmHA determines after a "reasonable period" that an agreement cannot be reached, the owner who sought to prepay must offer to sell the housing to "any qualified nonprofit organization or public agency at a fair market value determined by 2 independent appraisers."  § 1472(c)(5)(A)(i) (1994 ed.).  If an offer to buy is not

---

[2] In 1986, Congress had passed a temporary moratorium that precluded § 515 prepayments in most cases.  The moratorium originally was to expire in 1987, but it was extended into 1988 by another temporary measure. See note following 42 U. S. C. § 1472, p. 163 (1994 ed.).

made by a nonprofit organization or agency within 180 days, the FmHA may accept the owner's offer to prepay. § 1472(c)(5)(A)(ii). The offer-for-sale requirement may be avoided if the FmHA determines that prepayment will not "materially affec[t]" housing opportunities for minorities and one of two other conditions is met: Prepayment will not displace the tenants of the affected housing, or there is "an adequate supply of safe, decent, and affordable rental housing within the market area" and "sufficient actions have been taken to ensure" that such housing "will be made available" to displaced tenants. § 1472(c)(5)(G)(ii).

ELIHPA's implementing regulations establish a process by which the FmHA addresses prepayment requests. Under those procedures, the FmHA first "develo[ps] an incentive offer," making a "reasonable effort . . . to enter into an agreement with the borrower to maintain the housing for low-income use that takes into consideration the economic loss the borrower may suffer by foregoing *[sic]* prepayment." 7 CFR § 1965.210 (2002). Only if the borrower rejects that offer will the FmHA attempt to make the determinations—regarding the effect on minority housing opportunities, the displacement of tenants, and the supply of affordable housing in the market—required by 42 U. S. C. § 1472(c)(5)(G) before prepayment can be accepted. 7 CFR § 1965.215(a) (2002).[3]

B

Petitioners in *Franconia* filed this action in the United States Court of Federal Claims on May 30, 1997. Plaintiffs included petitioners—all of whom had entered into loan agreements before December 21, 1979, and were therefore

---

[3] In 1992, Congress passed the Housing and Community Development Act of 1992, 106 Stat. 3672, codified in relevant part at 42 U. S. C. § 1472(c) (1992 legislation). That provision, which had no effect on petitioners' loans, extended ELIHPA's restrictions to loans made after those of petitioners, *i. e.*, loans made from December 21, 1979, through 1989. See 106 Stat. 3841.

subject to ELIHPA—and others, who had entered into loan agreements after December 21, 1979, and were therefore unaffected by the Act. See App. to Pet. for Cert. A3, n. 2.[4] Petitioners alleged that ELIHPA repudiated their loan contracts, which, they asserted, gave them the right "to terminate their participation in the Government's housing program by exercising their option to prepay at any time." *Id.*, at A112. Their complaint sought relief on two theories: breach of contract and a violation of the Fifth Amendment's proscription against taking property without just compensation. See *id.*, at A132–A133.

The Court of Federal Claims granted the Government's motion to dismiss petitioners' contract claims as barred by the six-year statute of limitations in 28 U. S. C. § 2501. 43 Fed. Cl. 702 (1999). That provision states: "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." The court concluded that petitioners' contract claims first accrued on May 23, 1988, the effective date of regulations implementing ELIHPA. *Id.*, at 709. That was so, the court said, because those regulations breached the only performance required of the Government under the promissory notes: "to keep its promise to allow borrowers an unfettered prepayment right." *Id.*, at 710. The court also dismissed petitioners' takings claims *sua sponte;* because "the [Government] conduct . . . alleged to have constituted a taking" was "Congress's change of the prepayment option," the court reasoned, any claim based on that conduct "accrued at the time of the 1988 legislation." *Id.*, at 711.

The Federal Circuit affirmed the dismissal of petitioners' claims on timeliness grounds. 240 F. 3d 1358 (2001). The

---

[4] The claims of the latter group of *Franconia* plaintiffs remain pending before the Court of Federal Claims. See App. to Pet. for Cert. A3, n. 2.

Court of Appeals agreed with the Court of Federal Claims on the respective benefits and burdens generated by the promissory notes: Petitioners enjoyed "an unfettered right to prepay their loans at any time," *id.*, at 1363, while the Government had an obligation "to continue to allow borrowers" that option, *ibid.* If the Government's "continuing duty was breached," the court concluded, "the breach occurred immediately upon enactment of ELIHPA because, by its terms, ELIHPA took away the borrowers' unfettered right of prepayment." *Ibid.* Thus, the court ruled, the statute of limitations began to run on February 5, 1988, the date of ELIHPA's passage, see *id.*, at 1364;[5] given that limitations-triggering date, the court held, petitioners' claims, filed over nine years post-ELIHPA, were time barred.

In holding petitioners' claims untimely, the Federal Circuit rejected the argument pressed by petitioners that the passage of ELIHPA qualified as a repudiation. Were ELIHPA so regarded, petitioners' suit would be timely if filed within six years of either the date performance fell due (the date petitioners tendered prepayment) or the date on which petitioners elected to treat the repudiation as a present breach. "An anticipatory repudiation occurs," the Court of Appeals recognized, "when an obligor communicates to an obligee that he will commit a breach in the future." *Id.*, at 1363 (internal quotation marks omitted). "The doctrine of anticipatory repudiation does not apply in this case," the court reasoned, because after ELIHPA revoked the promise to allow unrestricted prepayment, the Government owed no future performance under the contracts. *Id.*, at 1364.

---

[5] The Federal Circuit thus disagreed with the Court of Federal Claims in one respect: The former concluded that petitioners' claims had accrued on the date of ELIHPA's enactment, while the latter held that those claims had accrued on the effective date of regulations implementing the Act. 240 F. 3d, at 1365, n. 3. This disagreement is irrelevant to, and rendered academic by, our resolution of the petitions.

Petitioners' takings claims were time barred for essentially the same reason, the Federal Circuit held. The "property" allegedly taken without just compensation was petitioners' contractual "right to prepay their FmHA loans at any time," *id.*, at 1365; the takings claim thus arose when, upon passage of ELIHPA, the Government "took away and conclusively abolished" the unrestricted prepayment option, *id.*, at 1366.[6]

On September 16, 1998, the *Grass Valley* petitioners, all of whom had entered into § 515 loan agreements before December 21, 1979, joined by other plaintiffs with post-1979 loans, filed an action in the Court of Federal Claims virtually identical to the *Franconia* action. On April 12, 2000, that court granted the Government's motion to dismiss the *Grass Valley* petitioners' contract claims for the reasons it had dismissed the claims of the *Franconia* petitioners. 46 Fed. Cl. 629, 633–635 (2000). The Federal Circuit affirmed without opinion. Judgt. order reported at 7 Fed. Appx. 928 (2001).[7]

We granted certiorari, 534 U. S. 1073 (2002), and now reverse the two judgments of the Federal Circuit before us for review.

---

[6] Like the Court of Federal Claims, see 43 Fed. Cl. 702, 708–709 (1999), the Federal Circuit rejected petitioners' "alternative argument" that even if the limitations period commenced to run upon enactment of legislation installing prepayment restrictions, the 1992 legislation, rather than ELIHPA, served as the operative provision. 240 F. 3d, at 1365, and n. 4. Petitioners contended that ELIHPA represented an emergency measure that curtailed prepayment rights only temporarily; the definitive legislative action, they maintained, occurred later, when the 1992 legislation made curtailment of their prepayment rights permanent. *Id.*, at 1365. The Federal Circuit concluded that although Congress had designated certain provisions in ELIHPA "interim measures," *ibid.* (internal quotation marks omitted), "no similar language . . . indicate[s] that [ELIHPA's] restrictions on FmHA loan prepayments were anything but permanent as to" borrowers in petitioners' situation, *ibid.*

[7] The Court of Federal Claims dismissed the *Grass Valley* petitioners' takings claims as untimely in a separate decision. 51 Fed. Cl. 436, 439 (2002).

II

A

A waiver of the sovereign immunity of the United States "cannot be implied but must be unequivocally expressed." *United States* v. *King*, 395 U. S. 1, 4 (1969). That requirement is satisfied here. Once the United States waives its immunity and does business with its citizens, it does so much as a party never cloaked with immunity. Cf. *Clearfield Trust Co.* v. *United States*, 318 U. S. 363, 369 (1943) ("The United States does business on business terms." (internal quotation marks omitted)).

Another threshold matter confines this controversy. For purposes of our disposition, the United States agrees, it may be assumed that petitioners obtained precisely the promise they allege—a promise that permits them an unfettered right to prepay their mortgages any time over the life of the loans, thereby gaining release from federal restrictions on the use of their property. See Brief for United States 18–19; Tr. of Oral Arg. 29–30. The sole issue before us is thus cleanly presented: were petitioners' complaints initiated within the six-year limitations period prescribed in 28 U. S. C. § 2501?

"When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Mobil Oil Exploration & Producing Southeast, Inc.* v. *United States*, 530 U. S. 604, 607 (2000) (internal quotation marks omitted). Under applicable "principles of general contract law," *Priebe & Sons, Inc.* v. *United States*, 332 U. S. 407, 411 (1947), whether petitioners' claims were filed "within six years after [they] first accrue[d]," 28 U. S. C. § 2501, depends upon when the Government breached the prepayment undertaking stated in the promissory notes. See 1 C. Corman, Limitations of Actions § 7.2.1, p. 482 (1991) ("The cause of action for breach of contract accrues, and the statute of limitations begins to run, at the time of the breach." (footnote

omitted)); see also 18 W. Jaeger, Williston on Contracts § 2021A, p. 697 (3d ed. 1978) (same).

In declaring ELIHPA a present breach of petitioners' loan contracts, the Federal Circuit reasoned that the Government had but one obligation under those agreements: "to continue to allow borrowers the unfettered right to prepay their loans at any time." 240 F. 3d, at 1363; see also 43 Fed. Cl., at 710 (Government's contractual duty was "to keep its promise to allow borrowers an unfettered prepayment right"). If that continuing duty was breached, the court maintained, the breach occurred *immediately*, totally, and definitively when ELIHPA took away the borrowers' unfettered right to prepay. See 240 F. 3d, at 1363. The Court of Appeals so ruled despite petitioners' insistence that "the government's performance obligation under the contracts was to *accept* prepayment" whenever tendered during the long life of the loans, even decades into the future. *Id.*, at 1362 (emphasis added); see also 43 Fed. Cl., at 710.

The Federal Circuit, we are persuaded, incorrectly characterized the performance allegedly due from the Government under the promissory notes. If petitioners enjoyed a "right to prepay their loans at any time," 240 F. 3d, at 1363, then necessarily the Government had a corresponding obligation to accept prepayment and execute the appropriate releases. See Brief for Petitioners 5–6. Absent an obligation on the lender to accept prepayment, the obligation "to allow" borrowers to prepay would be meaningless. A loan contract of such incomplete design would be illusory. See J. Murray, Contracts § 2, p. 5 (2d rev. ed. 1974) (promise required to create a binding contract must be an "undertaking or commitment to do or refrain from doing [some]thing in the future").

Once the Government's pledged performance is properly comprehended as an obligation to accept prepayment, the error in the Federal Circuit's reasoning becomes apparent. Failure by the promisor to perform at the time indicated for performance in the contract establishes an immediate

breach. See Restatement (Second) of Contracts § 235(2) (1979) (hereinafter Restatement) ("When performance of a duty under a contract is due[,] any non-performance is a breach."); Murray, *supra*, § 206, at 417. But the promisor's renunciation of a "contractual duty *before* the time fixed in the contract for . . . performance" is a repudiation. 4 A. Corbin, Contracts § 959, p. 855 (1951) (emphasis added); Restatement § 250 (repudiation entails a statement or "voluntary affirmative act" indicating that the promisor "will commit a breach" when performance becomes due). Such a repudiation ripens into a breach prior to the time for performance only if the promisee "elects to treat it as such." See *Roehm* v. *Horst*, 178 U.S. 1, 13 (1900) (repudiation "give[s] the promisee the right of electing either to . . . wait till the time for [the promisor's] performance has arrived, or to act upon [the renunciation] and treat it as a final assertion by the promisor that he is no longer bound by the contract").

Viewed in this light, ELIHPA effected a repudiation of the FmHA loan contracts, not an immediate breach. The Act conveyed an announcement by the Government that it would not perform as represented in the promissory notes if and when, at some point in the future, petitioners attempted to prepay their mortgages. See Restatement § 250, Comment *b* ("[A] statement of intention not to perform except on conditions which go beyond the contract constitutes a repudiation." (internal quotation marks omitted)); Murray, *supra*, § 208, at 421. Unless petitioners treated ELIHPA as a present breach by filing suit prior to the date indicated for performance, breach would occur when a borrower attempted to prepay, for only at that time would the Government's responsive performance become due.[8]

---

[8] The record indicates that at least one petitioner has attempted to prepay, see App. to Pet. for Cert. A157–A158, but contains no information about how many others have done so or when any such attempts took place, see 43 Fed. Cl., at 707. Application of our holding to each petitioner in light of such determinations is a task for the lower courts on remand.

In sum, once it is understood that ELIHPA is most sensibly characterized as a repudiation, the decisions below lose force. To recapitulate, "[t]he time of accrual . . . depends on whether the injured party chooses to treat the . . . repudiation as a present breach." 1 C. Corman, Limitation of Actions § 7.2.1, p. 488 (1991). If that party "[e]lects to place the repudiator in breach before the performance date, the accrual date of the cause of action is accelerated from [the] time of performance to the date of such election." *Id.*, at 488–489. But if the injured party instead opts to await performance, "the cause of action accrues, and the statute of limitations commences to run, from the time fixed for performance rather than from the earlier date of repudiation." *Id.*, at 488.

The Government draws no distinction "between a duty to allow petitioners to prepay and a duty to accept tendered prepayments"; "any such distinction," the Government acknowledges, "would be without significance." Brief for United States 33. Indeed, the Government recognizes, if petitioners had an "unfettered right to prepay," then, "of course," that right would be complemented by an "obligation to accept any prepayment tendered." *Ibid.* In defense of the judgment below, the Government relies on two other grounds.

First, the Government draws upon the text of § 2501, which bars any claims not "filed within six years after [the] claim first accrues." The words "first accrues," the Government contends, are key. See *id.*, at 11. Those words, according to the Government, convey Congress' intent to guard the sovereign against claims that might be deemed timely under statutes of limitations applicable to private parties. *Id.*, at 28. As the Government reads § 2501, the "first accrues" qualification ensures that suits against the United States are filed on "the earliest possible date," *id.*, at 17, thereby providing the Government with "reasonably prompt notice of the fiscal implications of past enactments," *id.*,

at 16. See *ibid*. ("[S]trict construction of [§ 2501] . . . serves the salutary purpose of ensuring that a Congress close to the one that enacted the statute [alleged to have caused a breach of contract]—rather than a Congress serving perhaps many decades later—may and must address the consequences."); see Tr. of Oral Arg. 45–46.

We do not agree that § 2501 creates a special accrual rule for suits against the United States. Contrary to the Government's contention, the text of § 2501 is unexceptional: A number of contemporaneous state statutes of limitations applicable to suits between private parties also tie the commencement of the limitations period to the date a claim "first accrues." See J. Angell, Limitations of Actions 536–588 (6th ed. 1876) (quoting state statutes of limitations). Equally telling, in its many years of applying and interpreting § 2501, the Court of Federal Claims has never attributed to the words "first accrues" the meaning the Government now proposes. Instead, in other settings, that court has adopted the repudiation doctrine in its traditional form when evaluating the timeliness of suits governed by § 2501. See *Plaintiffs in Winstar-Related Cases* v. *United States*, 37 Fed. Cl. 174, 183–184 (1997), aff'd *sub nom. Ariadne Financial Services Pty. Ltd.* v. *United States*, 133 F. 3d 874 (CA Fed. 1998). In line with our recognition that limitations principles should generally apply to the Government "in the same way that" they apply to private parties, *Irwin* v. *Department of Veterans Affairs*, 498 U. S. 89, 95 (1990), we reject the Government's proposed construction of § 2501. That position, we conclude, presents an "unduly restrictiv[e]" reading of the congressional waiver of sovereign immunity, *Bowen* v. *City of New York*, 476 U. S. 467, 479 (1986), rather than "a realistic assessment of legislative intent," *Irwin*, 498 U. S., at 95.[9]

---

[9] As petitioners observe, see Reply Brief 6, n. 6, the "first accrues" qualification might serve a meaningful purpose in the context of tolling of disabilities for successive claimants. In that context, the qualification would ensure that suit could be delayed only during the disability of the claim-

Two practical considerations reinforce this conclusion. Cf. *Crown Coat Front Co.* v. *United States*, 386 U. S. 503, 517 (1967) (the words "first accrues" must be interpreted "with due regard to those practical ends which are to be served by any limitation of the time within which an action must be brought" (internal quotation marks omitted)). Reading § 2501 as the Government proposes would seriously distort the repudiation doctrine in suits brought under the Tucker Act. Assuming a claim could "first accrue" for limitations purposes on the date of repudiation, but see *supra*, at 144, a party aggrieved by the Government's renunciation of a contractual obligation anticipating future performance would be compelled by the looming limitations bar to forgo the usual option of awaiting the time performance is due before filing an action for breach. The Government's construction of § 2501 would thus convert the repudiation doctrine from a shield for the promisee into a sword by which the Government could invoke its own wrongdoing to defeat otherwise timely suits. As Professor Corbin explained, "[t]he plaintiff should not be penalized for leaving to the defendant an opportunity to retract his wrongful repudiation; and he would be so penalized if the statutory period of limitation is held to begin to run against him immediately." Corbin, Contracts § 989, at 967; see *Roehm* v. *Horst*, 178 U. S., at 10 ("[I]t seems reasonable to allow an option to the injured party, either to sue immediately, or to wait till the time when the act was to be done, . . . which may be advantageous to the innocent party.").

There is also reason to doubt that the Government's reading of § 2501 would inure to the benefit of the United States. Putting prospective plaintiffs to the choice of either bringing suit soon after the Government's repudiation or forever relinquishing their claims would surely proliferate litigation.

---

ant to whom a right of action first accrued; successive claimants laboring under a disability would be unprotected by any tolling proviso. See J. Angell, Limitations of Actions 488, and n. 2 (6th ed. 1876).

Every borrower of FmHA loans, for example, would be forced to sue the Government within six years of ELIHPA's enactment in order to preserve a claim stemming from that Act. Faced with the prospect of forever forgoing such a claim, even a borrower that had not previously wished to prepay might well conclude that early exit from the FmHA program is the only safe course. The Government would thus find itself defending against highly speculative damages claims in a profusion of lawsuits, most of which would never have been brought under a less novel interpretation of §2501. See Tr. of Oral Arg. 33–34.[10]

The Government also seeks to avoid the repudiation doctrine by attacking as "futile" petitioners' "search for an exact parallel in contracts solely between private parties." Brief for United States 13. The law of repudiation does not govern here, the Government ultimately contends, because the "statement of intent not to perform" on which petitioners base their claim is an Act of Congress. *Id.*, at 24. According to the Government, a congressional enactment like ELIHPA that precludes the Government from honoring a contractual obligation anticipating future performance always constitutes a present breach. This is so, the Government maintains, because "the promisor"—the agency or official responsible for administering the contract—does not

---

[10] The Government's reliance on *McMahon* v. *United States*, 342 U. S. 25 (1951), is misplaced. Brief for United States 29–30. The Court there rejected an interpretation of the Suits in Admiralty Act that would have given tort plaintiffs "an option as to when they will choose to start the period of limitation of an action against the United States." 342 U. S., at 27. The reasoning in that case does not apply to petitioners' claims, which arise out of contracts in which the Government allegedly granted borrowers an option to demand performance, and thereby precipitate breach, at any time. See *supra*, at 141. And unlike the position rejected in *McMahon*, our ruling today ensures that suit must be brought within a fixed period after the date of injury—in this case, no later than six years after the Government's refusal to accept prepayment in accord with the terms of the promissory notes.

"remai[n] free to change its mind and render the requisite performance" without violating binding federal law. *Id.,* at 27. Accordingly, the Government concludes, the essential purpose of the repudiation doctrine—to avoid an unnecessary lawsuit by allowing the promisor an opportunity to adhere to its undertaking—is inapplicable.

We reject the Government's premise, and therefore its conclusion. Just as Congress may announce the Government's intent to dishonor an obligation to perform in the future through a duly enacted law, so may it retract that renouncement prior to the time for performance, thereby enabling the agency or contracting official to perform as promised. Indeed, Congress "change[d] its mind" in just this manner before it enacted ELIHPA. *Ibid.* In the 1979 amendments to the National Housing Act, Congress repudiated the promissory notes at issue here by conditioning prepayment of all § 515 loans on the borrower's agreement to maintain the low-income use of its property for a specified period. See Housing and Community Development Amendments of 1979, 93 Stat. 1134–1135. One year later, Congress removed those conditions on pre-1979 loans, thereby retracting the repudiation. See Housing and Community Development Act of 1980, 94 Stat. 1671–1672; *supra,* at 135.

We comprehend no reason why an Act of Congress may not constitute a repudiation of a contract to which the United States is a party. Congress may renounce the Government's contractual duties without triggering an immediate breach because Congress may withdraw that repudiation if given the opportunity to do so. "Hence, . . . the fact that [the Government's] repudiation rested upon the enactment of a new statute makes no significant difference." *Mobil Oil,* 530 U. S., at 620; see *id.,* at 619 ("[I]f legislation passed by Congress and signed by the President is not a 'statement by the obligor'" capable of triggering a repudiation, "it is difficult to imagine what would constitute such a statement." (quoting Restatement § 250)).

## B

To answer the question presented—when does the statute of limitations on petitioners' claims begin to run, see Pet. for Cert. i—we need not separately address petitioners' alternative theory of recovery based on the Takings Clause of the Fifth Amendment. The Federal Circuit's holding that takings relief was time barred hinged entirely on its conclusion that petitioners' contract claims accrued upon passage of ELIHPA. See 240 F. 3d, at 1365–1366. Because that conclusion was incorrect, we hold, the Federal Circuit erred in dismissing petitioners' takings theory on grounds of untimeliness.

\* \* \*

Concluding that each petitioner's claim is timely if filed within six years of a wrongly rejected tender of prepayment, we reverse the judgments of the Federal Circuit and remand the *Franconia* and *Grass Valley* cases reviewed herein for further proceedings consistent with this opinion.

*It is so ordered.*