GREGORY, Circuit Judge,
concurring in part and dissenting in part.
I respectfully dissent from the majority’s conclusion that the district court properly granted NIMA’s motion for summary judgment on Webster’s breach of contract claim regarding his promotion to Pay Band IV and his retaliation claim regarding his lateral transfer, as set forth in Sections III and IV.C, respectively. In my view, discovery into both of those matters was necessary prior to entering summary judgment against Webster. I concur with the majority’s opinion in all other respects.
I.
The majority asserts that the terms of the settlement agreement between Webster and NIMA were “quite specific,” “clear,” and “unambiguous.” Op. at-, -. The majority thus concludes that the discovery Webster requested regarding his promotion to Pay Band IV was neither relevant nor necessary to resolving his breach of contract claim. Op. at-. However, I find that discovery was warranted to clarify the meaning of the term “Pay Band 4” prior to entering summary judgment on this claim.
We generally apply commercial contract principles to government contract claims. United Kingdom Ministry of Def. v. Trimble Navigation Ltd., 422 F.3d 165,172 (4th Cir.2005) (citing Franconia Assocs. v. United States, 536 U.S. 129, 141, 122 S.Ct. 1993, 153 L.Ed.2d 132 (2002); United States v. Bankers Ins. Co., 245 F.3d 315, 321 (4th Cir.2001)). For instance, “[i]f the terms of the contract are clear and unambiguous, then we must afford those terms their plain and ordinary meaning; however, if the terms are vague or ambiguous, then we may consider extrinsic evidence to interpret those provisions.” Providence Square Assocs., LLC v. G.D.F., Inc., 211 F.3d 846, 850 (4th Cir.2000) (internal citations omitted). A contract is ambiguous where it is capable “of admitting of two or more meanings, of being understood in more than one way, or of referring to two or more things at the same time.” Nehi Bottling Co. v. All-American Bottling Corp., 8 F.3d 157,161 (4th Cir.1993) (internal quotations and citations omitted).
The settlement agreement states that “[t]he agency will promote the complainant to Pay Band 4, retroactive to 6 September 1999 within 30 days of the date that all parties have signed this agreement.” J.A. 134. However, the term “Pay Band 4” is ambiguous since it potentially refers to more than one GS-level and several steps to which Webster could have been promoted. Although the record is unclear as to the precise scope of Pay Band IV, Webster’s supervisor testified that Pay Band IV was approximately the equivalent of GS-13. J.A. 309.[1] Webster has asserted *582 that NIMA promoted him to GS-13, Step 2, which is within Pay Band IV, instead of promoting him to GS-13, Step 5, which could also be within Pay Band IV. J.A. 140.[2] Moreover, the settlement agreement on its face provides no clarification into the precise nature of Webster’s promotion. Contrary to what the majority suggests, Webster’s breach of contract claim regarding his promotion therefore rests entirely on the ambiguity of the term “Pay Band 4,” as it is employed in the settlement agreement, as opposed to terms unincorporated into the agreement.
I find that discovery regarding the intent of the parties was necessary with respect to the term “Pay Band 4” prior to entering summary judgment on Webster’s breach of contract claim. Yet the district court denied Webster’s Rule 56(f) motion to conduct depositions of NIMA counsel Jack Rickert and EEO Complaints Manager John Sutkowsky regarding the precise GS-level and step contemplated for his promotion. J.A. 98, 536-37. Accordingly, I conclude that the district court abused its discretion in denying Webster’s motion for discovery regarding his promotion, and erred in granting summary judgment on this claim. See Nguyen v. CNA Corp., 44 F.3d 234, 242 (4th Cir.1995); Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 245 (4th Cir.2002).
II.
The majority further acknowledges that Webster’s transfer and attendant loss of night pay differential could be considered an adverse employment action for the purposes of his retaliation claim. Op. at-. The majority nevertheless concludes that, even if the transfer constituted an adverse employment action, Webster “cannot demonstrate that he was singled out and transferred to the day shift in retaliation for his engaging in protected activities.” Id. In so doing, the majority relies on Webster’s counsel’s representation at oral argument on the motion for summary judgment that Webster “did not object to the day shift change because his supervisor made it clear that if he was going to advance, that he needed to accept this change from the night shift to a day shift.” J.A. 521.
The majority thus suggests that Webster himself viewed the transfer as a positive change, to the extent that he cannot show pretext. However, the record reflects that when Webster’s first-line supervisor, David Bialek, directly asked him whether he had any concerns regarding the transfer, Webster “gave me the impression that he felt it was mandatory and that he had no choice.” J.A. 232. Construed fairly, Webster’s failure to object to the transfer reveals his sense of futility *583 regarding the situation, rather than any perceived concurrence with his employer’s view that the transfer would enhance his promotion opportunities.
Even assuming that Webster could increase his promotion opportunities by heightened visibility on the day shift, Webster never had the opportunity to demonstrate that this reason was not the true reason for his transfer, but was merely a pretext for retaliation. By ending the analysis with NIMA’s proffered reason, the majority skips the third step of the McDonnell Douglas burden-shifting framework, which affords Webster the opportunity to show pretext or other evidence probative of retaliation. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (noting that after the employer presents its nondiscriminatory reason for the adverse employment action, the plaintiff “must ... be afforded a fair opportunity to show that [the employer’s] stated reason ... was in fact pretext”); see also Sutera v. Schering Corp., 73 F.3d 13, 18 (2d Cir.1995) (summary judgment inappropriate where the plaintiff, who admitted that he engaged in forgery, never had the opportunity to demonstrate that his “forgery of physicians’ signatures was not the true reason he was discharged, but was merely a pretext and that his discharge was motivated by discrimination”); Paquin v. Fed. Nat’l Mortgage Ass’n, 119 F.3d 23, 28 (D.C.Cir.1997); Kachmar v. SunGard Data Sys. Inc., 109 F.3d 173,183 (3d Cir.1997).
Significantly, information regarding the circumstances of Webster’s transfer was exclusively in the hands of his employer. Yet NIMA moved for summary judgment prior to the taking of any discovery, thereby precluding Webster from opposing the motion in a meaningful way. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 n. 5, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment inappropriate where “the nonmoving party has not had the opportunity to discover information that is essential to his opposition”); Harrods, 302 F.3d at 246-47 (“ ‘[Sjuffieient time for discovery is considered especially important when the relevant facts are exclusively in the control of the opposing party.’ ”) (quoting 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2741, at 419 (3d ed.1998)). Accordingly, I conclude that the district court abused its discretion in denying Webster’s motion for discovery regarding his transfer pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, and erred in granting summary judgment on this claim at that juncture. See Nguyen, 44 F.3d at 242; Harrods, 302 F.3d at 245.

. According to the 1999 pay table issued by the United States Office of Personnel Management ("OPM”), GS-13, Step 1 establishes an annual base compensation of $53,793, while *582 GS-13, Step 10 establishes an annual base compensation of $69,930. See http://www.opm.gov/oca/99TABLES/GSannual/fsc/99GSf.htm (last visited Nov. 14, 2005). GS-14, Step 1 sets forth tin annual base compensation of $63,567, while GS-14, Step 10 sets forth an annual base compensation of $82,638. Id. The official NIMA web site does not provide information regarding Pay Band IV, as it was established in 1999, but states that, as of January 9, 2005, Pay Band IV encompasses an annual base compensation range of $64,478 to $104,133 and is the equivalent of GS-13 through GS-14. http://www.nga.mil/portal/si te/nga01/index.jsp?epi-conten t=GENERIC & item-ID=85286150617a bfOOVgnVCMServer3c02010aRCRD & beanID = 1629630080 & viewID=Article (last visited Nov. 14, 2005).

. According to the 1999 OPM pay table, GS-13, Step 5 yields an annual base compensation of $60,965, while GS-13, Step 2 yields an annual base compensation of $55,586. J.A. 146.
To the extent that Webster further asserts that the parties had agreed to promote him retroactively to GS-14, Step 1 from March 2000, however, this second promotion is not incorporated into the settlement agreement and is therefore barred on the face of the agreement.