**R.C. BEESON, INC., Appellant**

v.

**COCA COLA COMPANY; Joseph E. Seagram & Sons, Inc.; Pernod Ricard USA, LLC; Diageo North America, Inc., Appellees.**

**No. 08–4150.**

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit LAR 34.1(a) July 10, 2009.

Opinion Filed: July 13, 2009.

Howard J. Schwartz, Esq., Wolff & Samson, West Orange, NJ, for Appellant.

Samuel S. Woodhouse, Esq., The Woodhouse Law Firm, Atlanta, GA, Brian S. Cousin, Esq., Greenberg Traurig, Florham Park, NJ, Jonathan E. Goldberg, Esq., Seyfarth Shaw, Brian D. Glueckstein, Esq., Philip L. Graham, Jr., Esq., Sullivan & Cromwell, New York, NY, Leda D. Wettre, Esq., Robinson, Wettre & Miller, Newark, NJ, for Appellees.

Before: SLOVITER, AMBRO and JORDAN, Circuit Judges.

## OPINION OF THE COURT

JORDAN, Circuit Judge.

R.C. Beeson, Inc. ("Beeson") appeals the order of the United States District Court for the District of New Jersey dismissing its Complaint [1] as barred by the applicable six-year statute of limitations. Beeson contends that the Court wrongly concluded that the breach of contract and unjust enrichment claims set forth in the Complaint accrued in 1993. In our view, however, the District Court was correct, and we will therefore affirm.

1. For ease of reference, we refer to the First Amended Complaint as the "Complaint".

2. The following information is drawn from Beeson's First Amended Complaint and documents referred to therein. *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) ("In evaluating a motion to dismiss, we may consider documents that are attached to or submitted with the complaint, ... and any matters incorporated by reference or integral to the claim, items subject to judicial notice,

## I. Background [2]

In 1982, Beeson was retained as a consultant by Joseph E. Seagram & Sons, Inc. ("Seagram") [3]. While in Seagram's employ, Beeson developed "Seagram Mixers," versions of various familiar non-alcoholic drinks, like ginger ale and tonic water. Seagram made those drinks the basis of a business deal with Coca–Cola Bottling Company of New York, Inc. ("CokeNY"), an entity distinct from appellee Coca Cola Company. Seagram and CokeNY entered into a Trademark License Agreement (the "TLA") which granted CokeNY the ability to both use the Seagram trademarks and sell the Mixers. The TLA provided that CokeNY "shall pay to Seagram a royalty of $.05 per Case (or its equivalent) in respect of any and all of the Licensed Soft Drinks sold under the Licensed Trademarks." (App. at 73.) It also included a provision stating that "[s]uch royalty shall increase at a compound rate of ten percent per year." (*Id.*)

Although Beeson was not a party to the TLA, Seagram had a separate agreement with Beeson (the "1982 Letter Agreement") under which Beeson was to receive 20% of the royalties received by Seagram under the TLA. The 1982 Letter Agreement also required that:

in the event that Seagram and [CokeNY] amend or supplement the [TLA] in a manner which materially changes the amount of the royalties payable to Seagram pursuant to Article IX [of the

matters of public record, orders, [and] items appearing in the record of the case.") (internal quotation and citation omitted).

3. Seagram no longer exists as a corporate entity but is a predecessor in interest to Diageo North American, Inc. ("Diageo") and Pernod Richard USA, LLC ("Pernod"). In 2001, Seagram's assets were purchased and divided between those companies, after which the Coca–Cola Company was granted a license to sell the Seagram's Mixers line.

TLA], Seagram shall negotiate in good faith with [Beeson] the amount of interest to be received by [Beeson] under the amended or supplemented License Agreement.

(*Id.* at 95–96.) Beeson and Seagram signed a second agreement in 1987 (the "1987 Letter Agreement") that extended the terms of the 1982 Letter Agreement to cover sales in Canada and confirmed the terms for sales in the United States.

The TLA was amended several times as the trademark license was assigned from one licensee to another, but the provisions regarding the amount of royalties and the rate at which they increased remained the same, until February 1, 1993. On that date, Seagram amended the TLA with its new licensee Premium Beverages, Inc. They agreed that, whereas royalty rates had previously increased annually at 10%, the yearly increase would thenceforth be pegged to the percentage increase in the Consumer Price Index ("CPI") for non-alcoholic beverages. While the parties do not specify how that change affected the royalty payments, it presumably lowered the amount received by Seagram and, at the same time, the payments of Seagram to Beeson. In derogation of the 1982 and 1987 Letter Agreements, however, Seagram did not then renegotiate its deal with Beeson. Nor did it announce to Beeson that the terms for escalating the royalty rate had been changed. Rather, it continued sending Beeson checks and quarterly statements, though the amounts were now consistent with the modified TLA. The change in payments did not go unnoticed. As Beeson acknowledged in its Complaint, it had, since the mid–1990s, "on an ongoing basis, inquired about, and challenged, the

statements and amounts sent to it and asked for explanations as to, and disputed, the calculations." (App. at 26.)

In August of 2000, Seagram and Beeson executed a third agreement (the "2000 Letter Agreement") on terms consistent with the first two letter agreements, providing Beeson with a 20% cut of the royalties received by Seagram. During the course of negotiations, Seagram asked Beeson to acknowledge that Seagram had satisfied all of its obligations to Beeson as of August 2000. Beeson declined. It did accept Seagram's manner of reporting but it demanded the right to audit Seagram's books to ensure the accuracy of payments. Significantly, Seagram insisted, and Beeson agreed, that Beeson's auditing right was limited to "time periods permitted by applicable law" and "subject to any and all defenses available to Seagram under applicable law." (*Id.* at 179.) Beeson did not seek to exercise its audit rights and continued to accept payments from Seagram.

On October 4, 2007, Beeson filed this suit. Seagram [4] then moved to dismiss the Complaint on the basis that Beeson's claims are time barred. The District Court agreed, concluding that Beeson was aware that Seagram had fundamentally modified its dealings with Beeson in 1993, when it began sending Beeson checks in a decreased amount based on the newly amended TLA. *Beeson, Inc. v. Coca Cola et al.,* 2008 WL 4447106, at *6 (D.N.J. Sept.26, 2008). The Court concluded that, rather than taking action, Beeson "idly stood by" until 2007. *Id.* at *3. By then, the Court determined, the relevant six-year statute of limitations had run and dismissal of Beeson's suit was appropriate. Beeson timely appealed.

---

4. Again for ease of reference, we refer to appellees, who are either successors in interest to Seagram, or, in the case of Coca Cola Company, a licensee, as "Seagram."

## II. Discussion[5]

In this diversity action, we look to the laws of New Jersey, the forum in which the District Court sits, to determine the applicable statute of limitations. *See Lafferty v. St. Riel*, 495 F.3d 72, 76 (3d Cir. 2007) ("[A] federal court must apply the substantive laws of its forum state in diversity actions and these include state statutes of limitations.") (internal citation omitted). The parties do not dispute that New Jersey law provides a six year statute of limitations "for recovery upon a contractual claim or liability." N.J. Stat. Ann. § 2A:14–1 (West 2000). However, they do dispute the date by which any claim of Beeson's could have accrued. Seagram contends that the statute of limitations began to run in 1993, when it effectively repudiated the 1982 and 1987 Letter Agreements by materially modifying the royalty calculation and failing to then renegotiate with Beeson. Beeson, on the other hand, claims that a new cause of action accrued with each new payment by Seagram until Beeson "discovered" Seagram's breach of contract in 2006. As did the District Court, we agree with Seagram and find Beeson's argument unpersuasive.

In determining the accrual date of a claim under an installment contract, New Jersey courts have recognized that a new claim arises for each missed payment or underpayment or other failure to comply with the contract terms. *See Matter of Liquidation of Integrity Ins. Co.*, 147 N.J. 128, 685 A.2d 1286, 1298 (1996) ("[I]n an installment contract, a new cause of action arises on the date on which each payment is missed.") (citing 4 Corbin on Contracts § 951 (1951 & Supp.1994)); *Metromedia*

*Co. v. Hartz Mountain Assocs.*, 139 N.J. 532, 655 A.2d 1379, 1381 (1995). However, an act of repudiation triggers a plaintiff's ability to sue for a breach as to the missed payment. *Metromedia*, 655 A.2d at 1381 (stating that where there is a continuing breach of an installment contract, "absent a repudiation, a plaintiff may sue for each breach only as it occurs, and the statute of limitations begins to run at that time"). Repudiation "entails a statement or 'voluntary affirmative act' indicating that the promisor 'will commit a breach' when performance becomes due." *Franconia Assocs. v. United States*, 536 U.S. 129, 143, 122 S.Ct. 1993, 153 L.Ed.2d 132 (2002) (quoting Restatement (Second) of Contracts § 250 (1981)). A single infraction of contractual obligations, such as a missed payment, is insufficient to constitute a "total breach" of the agreement unless accompanied by an anticipatory repudiation of future performance. Corbin on Contracts § 954. In other words, a combination of an act deliberately repudiating the agreement and an act indicating to the non-breaching party that any future performance either will not occur or will not be in compliance with the contract terms commences the running of the statute of limitations. *Cf. id.* (noting that where failure of performance is accompanied by anticipatory repudiation, there is a " 'total' breach, justifying immediate action for the remedies appropriate thereto").

Seagram's failure to renegotiate its agreement with Beeson after changing the TLA, and thereby changing the payments it would make to Beeson, was a material breach of the 1982 and 1987 Letter Agreements. The resulting diminished payments to Beeson, which Beeson recognized were

---

**5.** The District Court had jurisdiction under 28 U.S.C. § 1332. We have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over the Court's order dismissing the complaint pursuant to Fed.R.Civ.P. 12(b)(6), and view the facts in the light most favorable to appellant as the non-moving party. *McGovern v. City of Philadelphia*, 554 F.3d 114, 115 (3d Cir.2009).

inconsistent with the contract, were effective notice that Seagram did not intend to comply with its obligations, either to renegotiate with Beeson or to make payments as expected under the terms of the 1982 and 1987 Letter Agreements. *See Miller v. Fortis Benefits Ins. Co.*, 475 F.3d 516 (3d Cir.2007) (finding a "clear repudiation" under ERISA when beneficiary received underpayment of benefits for seventeen years.) In short, the obvious change and the refusal to renegotiate, despite Beeson's inquiries about the change, constituted a repudiation of the 1982 and 1987 Letter Agreements. *Cf. id.* ("[Plaintiff's] cause of action to adjust benefits accrued upon his initial receipt of the erroneously calculated award. The award he began receiving in 1987 constituted a repudiation of his right to greater payment.... This repudiation should have been clear to him upon initial receipt of payment in 1987—monthly checks based on a simple calculation of sixty percent of his salary should have alerted him that he was being underpaid.")

That Beeson understood that Seagram had repudiated those Letter Agreements is demonstrated by the negotiations it had with Seagram in 2000. The 2000 Letter Agreement evidences Seagram's focus on the statute of limitations. The parties agreed on audit rights subject to "time periods permitted by applicable law" and "any and all defenses available to Seagram under applicable law." (App. at 179.) Even with that, however, Beeson did not pursue any claims under the newly revised contract. It chose instead to do nothing to enforce the rights it now insists it has.

Beeson contends that, as the non-breaching party, it had the option to either wait to file suit until the time for Seagram's performance passed or to treat the repudiation as a breach. It asserts that each installment payment carries with it Seagram's continuing obligation to make payments in accordance with the 1982 and 1987 Letter Agreements and to negotiate following any material change in the TLA. But that argument misses the mark, because it ignores that Seagram's performance, including especially its obligation to renegotiate with Beeson, became due immediately upon its modification of the TLA. While the subsequent underpayments put Beeson on notice of the breach and were part of the fallout from it, they did not give Beeson the opportunity to delay action on its claim. If we were to view Seagram's obligation to renegotiate following a material change in the TLA as something existing in perpetuity, as Beeson suggests, the statute of limitations would be robbed of meaning.[6]

Allowing Beeson to pursue its claims after standing idle for over a decade would undermine New Jersey's statute of limitations. The District Court thus correctly determined that Beeson's claims are barred as untimely under New Jersey law.

## III. Conclusion

For the foregoing reasons, we will affirm.

---

6. We also note an open question as to whether Beeson's failure to assert its rights prior to or during the course of negotiations over the 2000 Letter Agreement constitutes an abandonment of any claim it might have had. *See Hosp. Computer Sys., Inc. v. Staten Island Hosp.*, 788 F.Supp. 1351, 1359 (D.N.J.1992) (finding plaintiff estopped from asserting breach of contract claim where plaintiff accepted deficient performance under an agreement "with full knowledge of the level of performance it could expect," thereby inducing the defendant "to provide further services that it intended to later assert were defective").