Justice Breyer,
with whom The Chief Justice joins, concurring in part and dissenting in part.
I join Parts I, II-A, II-B, and III of the Court’s opinion. Unlike the Court, however, I believe that North Carolina breached the Southeast Interstate Low-Level Radioactive Waste Management Compact (Southeast Compact or Compact) when it suspended its efforts toward building a waste disposal facility. (The Chief Justice joins all but Parts II-D and III-B of the Court’s opinion.)
Article 5(C) is the critical term of the Compact. It states:
“Each party state designated as a host state for a regional facility shall take appropriate steps to ensure that an application for a license to construct and operate a facility ... is filed with and issued by the appropriate authority.” Omnibus Low-Level Radioactive Waste Interstate Compact Consent Act (Consent Act), 99 Stat. 1877.
*364 In September 1986, North Carolina was “designated as a host state for a regional” low-level nuclear waste disposal “facility.” Ibid.; see also App. 417, 432. Soon thereafter, North Carolina’s General Assembly enacted legislation authorizing a state agency to “site, finance, [and] build” a waste disposal facility. N. C. Gen. Stat. § 104G-4 (1987) (repealed 2000). Pursuant to this legislation, a new facility was to be completed by January 1,1993. Ibid.
From August 1987 until December 1997, North Carolina took a series of steps to prepare for the construction of the storage facility. See Brief for North Carolina in Support of Exceptions to Reports of the Special Master 6-8. And while doing so it continually assured its Compact partners that it “remainfed] committed to fulfilling its obligations to the Compact to serve as the next host state.” App. 92 (Letter from James G. Martin, Governor of North Carolina, to Carroll A. Campbell, Jr., Governor of South Carolina (Oct. 25,1990)); Statement of Undisputed Material Facts ¶¶ 24-26, 28, 33, 37, 39 (detailing press releases, gubernatorial letters, and other statements made by North Carolina expressing its commitment to its Compact obligations).
But North Carolina never secured a license, never obtained adequate funding, and never began construction on a new facility. See Second Report of Special Master 2-3 (hereinafter Second Report). Eventually, the State simply stopped trying: On December 19, 1997, North Carolina informed its fellow member States that it would “commence the orderly shutdown” of the waste disposal “project.” App. 319. After this point, North Carolina admittedly took no further steps toward obtaining a license or building a facility before withdrawing from the Compact in July 1999. Id., at 460 (North Carolina Admissions ¶ 11) (North Carolina “did not [after 1997] take additional steps to . . . license a waste disposal facility”); Second Report 10 (“The parties do not dispute that North Carolina did not take additional steps to pursue a license for- a waste facility” after December 1997).
*365 Whatever one might think of the sufficiency of North Carolina’s activities during the previous decade, I do not see how the Court can find that a year and a half of doing nothing— which North Carolina admits it did between December 1997 and July 1999 — constitutes “tak[ing] appropriate steps.” If a student promises to “take appropriate steps to ensure” that he will pass the bar and then refuses to study, has he not broken his promise? More to the point, if a builder promises that he will “take appropriate steps to ensure” that a customer will be able to move into a new home in two years, and then does nothing at all, has the builder not broken his promise?
As the majority notes, “[o]ther contemporaneously enacted interstate compacts” delineated a host State’s obligations in more detail than the Southeast Compact does. Ante, at 347-348. But this fact may just as easily be read to indicate what the parties here intended, rather than, as the majority argues, what they did not intend. Regardless, the language of the Compact and the context in which it was enacted — as part of a congressional effort to encourage regional solutions to this Nation’s low-level radioactive waste problem, see Consent Act, 99 Stat. 1859; Low-Level Radioactive Waste Policy Act, § 4(a)(1), 94 Stat. 3348 — both indicate that North Carolina was supposed to take “appropriate steps” to build a low-level radioactive waste disposal facility. And North Carolina’s General Assembly passed a state statute recognizing and accepting this responsibility. See N. C. Gen. Stat. §104G-4 (creating a state agency to “site, finance, [and] build” a waste disposal facility). How can it be that two years of inactivity followed by withdrawal satisfies this promise?
The answer, says the Court, is that any further “appropriate steps” would have cost a significant amount of money. Ante, at 346, 347. In 1997, the Southeast Interstate Low-Level Radioactive Waste Management Commission (Commission), the entity responsible for administering the Com *366 pact, made clear that it would not advance North Carolina any more money toward building a facility. See App. 315. In response, North Carolina concluded that it was unwilling to fund the rest of the project itself. See id., at 317-319. And the Court agrees that it would have been “imprudent” for North Carolina to spend further funds, in light of the Commission’s refusal to do so also. Ante, at 347,348.
But this is an odd excuse. If a builder promises to “take appropriate steps” to build me a house, the fact that he runs out of funds would not normally excuse his breaking his promise — at least if it is he, and not I, who is responsible for financing the project. See 2 E. Farnsworth, Contracts § 9.6, p. 638 (3d ed. 2004) (hereinafter Farnsworth) (courts “generally” conclude that “additional expense” “does not rise to the level of impracticability” so as to excuse a party from performance). And here it is North Carolina, and not anyone else, who bears ultimate responsibility for finding the funds.
The text, structure, and purpose of the Compact all demonstrate this fact. As the Court recognizes, ante, at 335, the Compact expressly provides that the Commission “is not responsible for any costs associated with ... the creation of any facility,” Art. 4(E)(1), 99 Stat. 1876. Rather, the Compact States determined that each “party state” should take a turn as the “host state,” during which time that State would be obligated to build a facility and then operate it for 20 years. See Art. 3(A), id., at 1873; Art. 5(A), id., at 1877; Art. 5(C), ibid.; Art. 5(E), 103 Stat. 1289; see also Art. 3(C), 99 Stat. 1873-1874 (“Host states are responsible for the availability, the subsequent post-closure observation and maintenance, and the extended institutional control of their regional facilities”). The host State would then recover its upfront construction expenses from the considerable fees and surcharges charged to the waste generators served by the facility. N. C. Gen. Stat. §§ 104G-15(a), (b) (repealed 2000) (“It is the intent of the General Assembly that the cost of all activities [toward siting, building, and operating a facility] be *367 borne by the waste generators” who use it); Brief for Plaintiffs in Surreply to North Carolina’s Reply 1, n. 1 (noting that a disposal facility in South Carolina collected over $47 million in fees in 2008).
Of course, as the majority notes, South Carolina’s withdrawal from the Compact could have affected North Carolina’s ability to “recoup” its “construction costs.” Ante, at 349. But, as far as I am aware, North Carolina did not seriously seek to amend the Compact when South Carolina departed (even though the State had sought and obtained an amendment previously, see ante, at 352, n. 4; Brief for North Carolina in Reply to Exceptions by Plaintiffs to Reports of the Special Master 27), nor has it argued to this Court that South Carolina’s departure voided its contractual obligations. Indeed, there is evidence in the record indicating that, even after South Carolina left the Compact, North Carolina continued to believe that the operation of a waste disposal facility presented a substantial financial opportunity. App. 255, 266 (Attachment to Letter from John H. MacMil-lan, Executive Director, North Carolina Low-Level Radioactive Waste Management Authority, to Richard S. Hodes, M. D., Chairman, Southeast Compact Commission (Dec. 13, 1996)) (enclosing a business plan identifying $600 million in cost savings that could provide a “substantial return” on the “investment needed to put the North Carolina facility into operation”).
I thus cannot conclude, as the majority does, that the Compact’s rotational design, as I understand it, is “foolish.” Ante, at 349. Rather, the Compact’s structure represents what, in my view, was an understandable decision by the contracting States, all of whom needed a waste disposal facility, to bind themselves together so that each would take a turn “bear[ing] the cos[t] of building” the necessary facility. Preliminary Report of Special Master 21 (citing Art. 4(K), 99 Stat. 1876); see Brief for Rocky Mountain Low-Level Radioactive Waste Compact Board et al. as Amici Curiae 16-18. *368 This rotational approach is surely a sensible solution to the problems caused by the widespread existence of low-level nuclear waste and the political unpopularity of building the necessary facilities to house it. See id., at 13-16; New York v. United States, 505 U. S. 144, 149-151 (1992).
The only contrary evidence — i. e., that indicates that North Carolina did not bear ultimate funding responsibility — consists of the fact that the Commission voluntarily advanced North Carolina nearly $80 million between 1988 and 1998 in order to help it defray its costs. Second Report 16. The Court believes that this “course of performance” demonstrates that, once the Commission turned off its monetary spigot, North Carolina was no longer required to do anything further. Ante, at 346-347. But why? If I advance my builder half the cost of a building, I have not thereby promised to advance him the whole cost. This is particularly true when the contract says I am responsible for none of the cost of the building. At the very least, something more in the circumstances would have to show that additional expenditure had become a reasonable expectation.
In this case, nothing suggests that North Carolina could reasonably expect further financing assistance. Indeed, I can And nothing in the majority’s opinion, or the record, that suggests that the Commission or the other Compact States intended to let North Carolina off the hook. And numerous documents indicate precisely the opposite — that despite the Commission’s funding assistance, North Carolina was still responsible for funding the project. See, e. g., App. 63 (Resolution (Feb. 9, 1988)) (“[T]he Commission, although not obligated to do so under the Compact,” provides funding for North Carolina); id., at 215 (Letter from Richard S. Hodes, M. D., Chairman, Southeast Compact Commission, to James B. Hunt, Governor of North Carolina (Jan. 5, 1996)) (“At some point, Commission funds will no longer be available to North Carolina ..., and North Carolina will need to make alternate plans . . . ”); id., at 75 (Press Release by *369 James G. Martin, Governor of North Carolina (Nov. 8,1989)) (“‘The task of siting and operating a low-level radioactive waste disposal facility is a commitment the state of North Carolina has made and one which I am personally committed to keeping’”); id., at 92 (Letter from James G. Martin, Governor of North Carolina, to Carrol A. Campbell, Jr., Governor of South Carolina (Oct. 25, 1990)) (“North Carolina remains committed to fulfilling its obligations to the Compact to serve as the next host state”); id., at 183 (Letter from James B. Hunt, Jr., Governor of North Carolina, to David M. Beasley, Governor of South Carolina (Mar. 14, 1995)) (“Let me assure you that North Carolina is committed to honoring its obligation to the Compact”); Statement of Undisputed Material Facts ¶¶28, 33, 39 (other public statements about North Carolina’s commitment to building a facility).
Without better evidence of a reallocation of funding responsibility, I can only conclude that North Carolina remained under an obligation to “take appropriate steps” at all times relevant to this case. And North Carolina admittedly took no steps towards building a disposal facility from December 1997 to July 1999: It did no indepth study of the further financing that might be necessary; it made no serious effort to look for alternative funding; the Executive of the State did not ask its legislature for any appropriation. Rather, North Carolina simply withdrew from the Compact. Ante, at 337.
Of course, North Carolina was free to withdraw from the Compact. Art. 7(G), 99 Stat. 1879-1880. But that fact does not repair what, in my view, was a breach of a key contractual provision. See Franconia Associates v. United States, 536 U. S. 129, 142-143 (2002) (“Failure by the promisor to perform ... establishes an immediate breach”); Restatement (Second) of Contracts §235(2) (1979) (“When performance of a duty under a contract is due any non-performance is a breach” (emphasis added)); 2 Farnsworth § 8.8, at 471.
With respect, I dissent.