# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BIOVERIS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 8692-VCMR |
| | ) | |
| MESO SCALE DIAGNOSTICS, LLC, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MESO SCALE TECHNOLOGIES, LLC | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: September 6, 2017
Date Decided: November 2, 2017

Joel Friedlander and Christopher M. Foulds, FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; Nancy J. Sennett, James T. McKeown, and Eric L. Maassen, FOLEY & LARNDER LLP, Milwaukee, Wisconsin; *Attorneys for Plaintiff BioVeris Corporation.*

David E. Ross and Bradley R. Aronstam, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Mark C. Hansen, Michael J. Guzman, Joshua Hafenbrack, and Hilary P. Gerzhoy, KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C., Washington, District of Columbia; *Attorneys for Defendants Meso Scale Diagnostics, LLC, and Meso Scale Technologies, LLC.*

**MONTGOMERY-REEVES, Vice Chancellor.**

In 1995, Meso Scale Technologies and IGEN International, which became BioVeris Corporation, formed a joint venture, Meso Scale Diagnostics, to pursue the development of electrochemiluminescence technology. The companies worked together for almost a decade before their relationship began to deteriorate. The first decade of their relationship was marked by collaboration, but the second decade was marked by litigation. In 2004, BioVeris filed two lawsuits against Meso Scale Diagnostics and Meso Scale Technologies. They settled both disagreements that same year. The settlement effectuated the sale of BioVeris's thirty-one percent interest in Meso Scale Diagnostics to Meso Scale Technologies. Unfortunately, that was not the end of the disputes that would arise between BioVeris and Meso Scale Technologies.

The case presently before me arose in 2013 from the 2004 settlement agreement. In essence, this dispute is about the final purchase price for BioVeris's thirty-one percent interest in Meso Scale Diagnostics. BioVeris argues that Meso Scale Technologies failed to pay the entire purchase price and breached the 2004 settlement agreement when it stopped payments in 2010. Conversely, Meso Scale Technologies argues that, in 2008, BioVeris released Meso Scale Technologies for the money allegedly owed. In the alternative, Meso Scale Technologies argues that BioVeris's claims are barred by laches.

1

I grant Defendants' Motion for Summary Judgment because I hold that BioVeris's claims are barred by laches. BioVeris failed to brings its claims within the analogous three-year statute of limitations for breach of contract claims, and there are no unusual conditions or exceptional circumstances to justify disregarding the analogous statute of limitations.

## I. BACKGROUND

The facts in this opinion are drawn from Plaintiff's Verified Complaint (the "Complaint"), Plaintiff's Corrected Brief in Opposition to Defendants' Motion for Summary Judgement, the exhibits Plaintiff submitted with the affidavit of Christopher P. Quinn, and the exhibits Defendants submitted with the affidavit of David E. Ross.

### A. Parties and Relevant Non-Parties

Plaintiff BioVeris Corporation ("BioVeris") is a Delaware corporation with its principal place of business in Indianapolis, Indiana.

Defendant Meso Scale Diagnostics, LLC ("Diagnostics") and Defendant Meso Scale Technologies, LLC ("Meso") are Delaware limited liability companies with their principal places of business in Rockville, Maryland. Diagnostics was organized as a joint venture between IGEN International, Inc. ("IGEN") and Meso.

IGEN was a California corporation and the predecessor in interest to BioVeris.

Non-party Jacob Wohlstadtler, a resident of Maryland, is the sole member of Meso.

## B. Facts

### 1. The joint venture

On November 30, 1995, Diagnostics, Meso, and BioVeris (then IGEN) entered into a joint venture agreement, which the parties overhauled in a 2001 amendment (the "JVA").[1] Several sections of the JVA are relevant to the present litigation.

First, the JVA provides a mandatory procedure to resolve disputes arising under the JVA. Section 7.2 provides a pre-arbitration, twenty-day negotiations period followed by binding arbitration in Washington, D.C. under the auspices of the American Arbitration Association.[2] Section 7.2 allows the tolling of any applicable statute of limitations for the duration of negotiations and arbitration as long as the arbitration is filed within sixty days of the end of good faith negotiations.[3]

Second, the JVA provides buy-out procedures in Section 8.5, granting Defendants the right to purchase all of BioVeris's interest if the joint venture is

---

[1]      Ross Aff. Ex. 1, at 1.

[2]      *Id.* at Ex. 3, at 22-23.

[3]      *Id.* at 24.

terminated.[4] Section 8.5.3(a) allows Defendants jointly to purchase all of BioVeris's interest "by paying to [BioVeris] the purchase price determined pursuant to Section 8.5.4 (the 'Purchase Price') in accordance with this Section 8.5.3."[5] Section 8.5.3(b) outlines the process by which Defendants would "make payments to [BioVeris] with respect to the unpaid amount of the Purchase Price, plus accrued interest . . . ."[6] The formula for quarterly payments is: "(i) five percent (5.00%) of the amount of [Diagnostic] Net Sales (as defined below), and (ii) twenty percent (20%) of the net proceeds realized by [Diagnostics] from the sale of its debt or equity securities in any third party financing . . . ."[7] Section 8.5.4(a) states for purposes of Section 8.5.3:

> [T]he Purchase Price shall be equal to (i) the fair market value of the [BioVeris] Interests at the time, as determined in accordance with Section 8.5.4.(b) and either Section 8.5.4.(c) or Section 8.5.4.(d), as applicable ("FMV"), reduced by (ii) the highest of the discount factors set forth in Section 8.5.4.(e) that are applicable.[8]

---

[4] *Id.* at 26-33; *Id.* at Ex. 1, at 15-16.

[5] *Id.* at Ex. 2, at 26.

[6] *Id.* at 27.

[7] *Id.*

[8] *Id.* at 29.

4

Section 8.5.5 requires BioVeris to remove its designee from the Board of Managers if Defendants exercise their right to buy BioVeris's interest under 8.5.3.[9]

Finally, the JVA includes a provision for special remedies if Defendants default on the Purchase Price. Section 8.5.6(a) allows BioVeris to put a designee back on the Board of Managers if Meso defaults on its obligation to pay the Purchase Price and the default is not cured within thirty days of receipt of written notice of default from BioVeris.[10] Section 8.5.6(b) automatically adds an amount equal to fifteen percent of the unpaid Purchase Price to the outstanding principle amount in the event of default.[11]

### 2. The joint venture terminates in 2004

On February 13, 2004, Roche Holdings AG[12] acquired IGEN and converted IGEN to BioVeris.[13] This transaction terminated the joint venture between IGEN and Meso, and on February 29, BioVeris sent termination notices to Meso.[14] On April 29, Meso sent a letter notifying BioVeris that Defendants were invoking

---

[9] *Id.* at 32.

[10] *Id.*

[11] *Id.*

[12] Roche Holdings AG is not a party to this case nor involved in any relevant way.

[13] Quinn Aff. Ex. 39, at 3.

[14] *Id.* at Exs. 42-43.

5

Section 8.5.3 of the JVA.[15]  The April 29 letter also requested that BioVeris remove its designee from the Board of Managers under Section 8.5.5 "as soon as possible."[16]

On June 14, BioVeris filed two lawsuits in the Court of Chancery related to Meso's attempt to trigger Section 8.5.5, as well as allegations that Meso's sole member, Wohlstadter, breached his fiduciary duties to Diagnostics.[17]

### 3.    The 2004 Settlement Agreement

On August 12, 2004, BioVeris, Diagnostics, Meso, and Wohlstadter entered into an agreement to resolve both outstanding lawsuits in the Court of Chancery (the "Settlement Agreement").  The recitals of the Settlement Agreement read, in part:

> WHEREAS, there is an action currently pending in the Court of Chancery of the State of Delaware in and for New Castle County (the "Delaware Court") styled *BioVeris Corp. v. Wohlstadter*, C.A. No. 507-N (the "§18-110 Action"), brought by BioVeris against Jacob N. Wohlstadter ("Wohlstadter"), Meso Scale Technologies LLC ("[Meso]"), and [Diagnostic] (collectively, the "Defendants").
>
> WHEREAS, there is an action currently pending in the Delaware Court styled *BioVeris Corp. v. Wohlstadter*, C.A. No. 572-N (the "Fiduciary Duty Action" collectively with the §18-110 Action, the "Actions"), brought by BioVeris against Defendants.

---

[15]    *Id.* at Ex. 44.

[16]    *Id.*

[17]    *Id.* at Exs. 48-49.

6

WHEREAS, the Actions, in part, arose out of the Joint Venture Agreement (the "JVA") dated November 20, 1995 (as amended August 15, 2001) by and among [Diagnostic], [Meso] and BioVeris (as successor in interest to IGEN International, Inc.) and the [Diagnostic] Limited Liability Company Agreement ("[Diagnostic] LLC Agreement") dated November 30, 1995 (as amended August 15, 2001); and

WHEREAS, the parties have reached an agreement, set forth herein (the "Agreement"), providing for settlement of the Actions, on the terms, and subject to the conditions set forth below (the "Settlement").[18]

The Settlement Agreement includes several other provisions relevant to this litigation. Section 1 confirms the parties' agreement to proceed with the buyout process originally set forth in Sections 8.5.3 and 8.5.4 of the JVA.[19] Section 17 amends the Purchase Price in Section 8.5.4 of the JVA to include the Pro Rata Rent Share[20] through August 31, 2005.[21] Section 17 also includes the parties' agreement to "reconcile the actual accrued Pro Rata Rent Share (as defined in the subleases)

---

[18]  *Id.* at Ex. 50, at 1.

[19]  *Id.*

[20]  "[A]s defined in the subleases between BioVeris and [Diagnostics]." *Id.* at 7.

[21]  *Id.*

and make any necessary adjustments to the Purchase Price (as defined in the JVA) arising from such reconciliations."[22]

The parties agreed to a dispute resolution scheme for any disputes arising out of the Settlement Agreement. Sections 23 and 24 outline an audit procedure as the sole remedy for disputes related to the calculation of the five percent payments under Section 8.5.3.[23] All other disputes "arising out of or relating in any way to this Agreement or the Settlement" must be litigated in the courts of Delaware.[24] Further, the prevailing party in any action to enforce the Settlement Agreement may recover costs and attorneys' fees.[25]

Finally, the Settlement Agreement includes an entire agreement and savings clause (Section 45) which reads:

> This Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof, and supersedes all prior or contemporaneous oral or written agreements, understandings or representations. Unless otherwise modified herein, the written agreements between or among the parties, including without limitation, the JVA, the [Diagnostic] LLC Agreement and

---

[22] *Id.*

[23] *Id.* at 8.

[24] *Id.* at 12.

[25] *Id.* at 13.

8

the License Agreement, shall remain in full force and effect.[26]

After executing the Settlement Agreement, Meso bought out BioVeris's thirty-one percent interest in Diagnostics.[27] The parties conducted three separate appraisals under Section 3 of the Settlement Agreement and determined the value of BioVeris's interest to be $9.89 million.[28] On November 2, 2004, BioVeris sent Diagnostics a predicted total for the Pro Rata Rent Share through August 31, 2005 equal to $2,337,243.[29] This figure includes the actual Pro Rata Rent Share for March to September 2004 and the projected Pro Rata Rent share for October 2004 to August 2005.[30] The parties do not dispute that they never finished the reconciliation process required by Section 17 of the Settlement Agreement.[31]

In 2005 and 2006, Meso drew down the $2 million prepayment credit provided as part of BioVeris's seller financing.[32] Starting in 2007, Meso made

---

[26]   *Id.* at 14.

[27]   Opp'n Br. 9.

[28]   *Id.*

[29]   Ross Aff. Ex. 6, at BioVeris 0006617.

[30]   Opp'n Br. 9.

[31]   Oral Arg. Tr. 38.

[32]   Ross Aff. Ex. 26, at MSD-0011092-93.

quarterly payments equal to five percent of its quarterly net sales.[33] A standard letter setting out Diagnostics's Net Sales for the previous quarter as well as the five percent amount being wired to BioVeris accompanied each quarterly payment.[34] The letters read, "[t]he payment due to BioVeris under Section 8.5.3 of the Joint Venture Agreement is $[amount being wired]."[35]

### 4. The 2010 Letter

On May 28, 2010, Meso sent BioVeris its quarterly report and payments.[36] The accompanying letter (the "2010 Letter") deviated from the form letters Meso had sent previously and read in relevant part, "[t]he payment due to BioVeris under Section 8.5.3 of the Joint Venture Agreement is $430,670, which represents the remaining balance due on the Purchase Price (including accrued interest)."[37] Meso made no further payments towards the Purchase Price after May 28, 2010.[38]

---

[33]    *Id.*

[34]    The letters are exactly the same except for the dates and dollar amounts of the quarterly payments. *See, e.g.*, *id.* at Exs. 27-28.

[35]    *Id.*

[36]    *Id.* at Ex. 26.

[37]    *Id.*

[38]    Opp'n Br. 21.

BioVeris did not communicate with Meso about the 2010 Letter until April 30, 2013.[39]

### 5. The 2013 communications

On April 30, 2013, BioVeris sent a "Notice of Default and Demand for Payment of Amount Due for Purchase of Diagnostics Member Interests and Request for Acknowledgement."[40] On May 17, Meso responded to the April 30 letter asserting that "no further amounts are due in respect of the Purchase Price."[41] Meso further stated that any disputes would need to be resolved under Sections 23 and 24 of the Settlement Agreement.[42] On May 28, BioVeris purported to open "the 20-day period of negotiations pursuant to Section 7.2 of the Joint Venture Agreement, as amended."[43] On June 12, Meso responded, reiterating its view that it owed nothing further under the Purchase Price and that the Settlement Agreement governed any disputes about the Purchase Price.[44]

---

[39]     Ross Aff. Ex. 31; Ross Aff. Ex. 30, at 52.

[40]     Ross Aff. Ex. 32, at MSD-0002215.

[41]     *Id.* at MSD-0002217.

[42]     *Id.* at MSD-0002215.

[43]     *Id.* at MSD-0002219.

[44]     *Id.* at MSD-0002221.

**6.** **The present litigation**

BioVeris filed its Complaint on June 28, 2013. Meso filed its first Motion for Summary Judgment on January 22, 2016, before discovery concluded. I heard oral argument on May 5, 2016, and denied the motion on August 5, 2016. Meso filed its second Motion for Summary Judgment on April 10, 2017. I heard oral argument on that motion on September 6, 2017.

## II. ANALYSIS

Plaintiff argues Defendants failed to pay the full Purchase Price owed under the Settlement Agreement. Plaintiff seeks monetary damages, a contractual penalty for defaulting on the Purchase Price, appointment of a representative to Diagnostic's board, and attorneys' fees for this action. Defendants argue that there is no need for a trial because the undisputed facts show that the claims are barred by laches,[45] and thus, summary judgment should be granted.

Summary judgment will be "granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

---

[45] Defendants argue, in the alternative, that BioVeris's claims were released by a 2008 agreement between the parties, but I need not address this argument as the claim is barred by laches.

judgment as a matter of law."[46] When considering a motion for summary judgment, the evidence and the inferences drawn from the evidence are to be viewed in the light most favorable to the nonmoving party.[47]

In order to grant summary judgment based on laches, I must determine which analogous statute of limitations applies. "[T]he limitations of actions applicable in a court of law are not controlling in equity,"[48] because, in equity, the defense of laches applies.[49] Laches is an equitable doctrine "rooted in the maxim that equity aids the vigilant, not those who slumber on their rights."[50] When an equitable claim seeks legal relief or a legal claim seeks equitable relief, the court will apply the statute of limitations by analogy and bar the claims outside the limitations period "absent tolling or extraordinary circumstances."[51] When a plaintiff brings a "legal action [seeking legal relief] in the Court of Chancery as a result of ancillary jurisdiction or some other jurisdictional source," that plaintiff "should not be placed

---

[46] *Twin Bridges L.P. v. Draper*, 2007 WL 2744609, at *8 (Del. Ch. Sept. 14, 2007) (citing Ct. Ch. R. 56(c)).

[47] *Judah v. Del. Trust Co.*, 378 A.2d 624, 632 (Del. 1977).

[48] *Reid v. Spazio*, 970 A.2d 176, 183 (Del. 2009).

[49] *IAC/InterActiveCorp v. O'Brien*, 26 A.3d 174, 177 (Del. 2011).

[50] *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 974 (Del. Ch. 2016).

[51] *Id.* at 983.

13

in a potentially better position to seek to avoid a statute of limitation than if she had filed in a Delaware court of law by invoking the more flexible doctrine of laches."[52] Thus, to avoid allowing a plaintiff to benefit from the more flexible doctrine of laches the statute of limitations logically should apply by analogy strictly and the traditional laches analysis should not apply.[53] Delaware law recognizes an exception to this general rule and will not apply the analogous statute of limitations if there are "unusual conditions or extraordinary circumstances" that justify not applying it.[54]

Ultimately, whether laches, through an analogous statute of limitations, bars he claims in this case depends on this Court's interpretation of the agreements between the parties. "[T]he threshold inquiry when presented with a contract dispute on a motion for summary judgment is whether the contract is ambiguous."[55] Ambiguity exists "when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[56] "Ambiguity does not exist simply because the parties disagree about

---

[52]  *Id.*

[53]  *Id.* at 982.

[54]  *Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 770 (Del. 2013).

[55]  *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007).

[56]  *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

14

what the contract means."[57] The moving party will be entitled to summary judgment where it can show its construction of the contract "is the only reasonable interpretation."[58]

When interpreting a contract, the court will give effect to the parties' intent based on the parties' words and the plain meaning of those words.[59] "If parties introduce conflicting interpretations of a term, but one interpretation better comports with the remaining contents of the document or gives effect to all the words in dispute,"[60] then, "as a matter of law and without resorting to extrinsic evidence, [the court may] resolve the meaning of the disputed term in favor of the superior interpretation."[61]

### A. BioVeris's Claims for Damages and Attorneys' Fees Are Barred by Laches

BioVeris does not dispute that only two options for seeking relief exist under the Settlement Agreement.[62] First, Section 23 provides an audit procedure "focused

---

[57] *United Rentals, Inc.*, 937 A.2d at 830.

[58] *Id.*; *see also Rhone-Poulenc*, 616 A.2d at 1198.

[59] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[60] *Wills v. Morris*, 1998 WL 842325, at *2 (Del. Ch. Nov. 6, 1998).

[61] *Id.*

[62] Oral Arg. Tr. 44-48.

15

solely upon the payments under Section 8.5.3 of the JVA . . ., in order to verify the amounts of payments made by [Diagnostic] to BioVeris."[63]  Second, Section 34 states:

> The parties agree that any dispute arising out of *or relating in any way to this Agreement or the Settlement* shall not be litigated or otherwise pursued in any forum or venue other than the courts of Delaware, and the parties expressly waive any right to demand a jury trial as to any such dispute.[64]

For the reasons set forth below, BioVeris's claims for the remainder of the Purchase Price and attorneys' fees arise under the Settlement Agreement, must have been sought in the courts of Delaware; these claims now are barred by laches because they were not brought within the analogous statute of limitations and no tolling doctrines, unusual conditions, or extraordinary circumstances exist.

### 1. The Settlement Agreement, and not the JVA, governs BioVeris's claims for the remainder of the Purchase Price and attorneys' fees

BioVeris seeks two forms of relief under the Settlement Agreement. First, BioVeris asks for an award for damages in the amount of $3,088,777 plus interest as the balance of the Purchase Price Meso allegedly owes under Section 1 of the

---

[63]  Quinn Aff. Ex. 50, at 8.

[64]  *Id*. at 12-13 (emphasis added).

16

Settlement Agreement.[65]  Paragraph 23 of BioVeris's Complaint reads, "[p]ursuant to Section 1 of the Settlement Agreement, Meso agreed to pay BioVeris the Purchase Price in accordance with the terms of the Settlement Agreement and the provisions of the JVA incorporated by reference therein."[66]  As BioVeris explains in its Complaint, relevant sections of the JVA were incorporated into the Settlement Agreement.[67]  Nothing, however, indicates that any incorporation happened in reverse, which would be necessary for BioVeris to enforce its right to the Purchase Price agreed to in the Settlement Agreement under the JVA.  Thus, the Settlement Agreement—not the JVA—provides the remedy for the unpaid portion of the Purchase Price, and any such remedy must have been pursued in the courts of Delaware pursuant to Section 34 of the Settlement Agreement.[68]

---

[65]     Compl. ¶¶ 5-6.

[66]     *Id.* ¶ 23.

[67]     *Id.* ¶ 2.

[68]     Meso argues the dispute is governed by Section 23 of the Settlement Agreement, which would have required BioVeris to seek an audit within one year of the breach. Opening Br. 33-34.  I need not address this argument because BioVeris's claim is barred by laches even under the more generous three-year statute of limitations for breach of contract claims.

17

Second, BioVeris asks for attorneys' fees and costs under Section 40 of the Settlement Agreement.[69]  Section 40 reads, "[t]he prevailing party in any action to enforce this Agreement shall be entitled to recover, in addition to any other relief awarded, court costs and reasonable attorney fees and costs incurred in connection with such action."[70]  The JVA does not include any provision for recovering attorneys' fees.  There can be no question then that any action seeking this relief must be brought under Section 34 of the Settlement Agreement in the courts of Delaware.

BioVeris has failed to show how the JVA's dispute resolution procedures would govern the claims arising from the Settlement Agreement.[71]  This is because the Settlement Agreement "constitutes the entire agreement among the parties with respect to *the subject matter hereof*, *and supersedes all prior or contemporaneous*

---

[69]   Compl. 8.

[70]   Quinn Aff. Ex. 50, at 13.

[71]   Even if there was some argument for applying the JVA, Section 7.2 of the JVA and Section 34 of the Settlement Agreement are irreconcilable, as both sections are exclusive as to the dispute resolution procedure.  Because there is no way for a party to comply with both dispute resolution provisions the later in time provision, Section 34, supersedes the earlier provision, Section 7.2.  *Country Life Homes, Inc. v. Shaffer*, 2007 WL 333075, at *5 (Del. Ch. Jan. 31, 2007) ("The new contract, as a general matter, will control over the old contract with respect to the same subject matter to the extent that the new contract is inconsistent with the old contract or if the parties expressly agreed that the new contract would supersede the old one.").

18

*oral or written agreements, understandings or representations*."[72]   Under the

Settlement Agreement, BioVeris was required to pursue these claims in the courts

of Delaware.[73]   As the Settlement Agreement's dispute resolution procedure

governed the claims for the remainder of the Purchase Price and attorneys' fees,

these claims had to be brought in the courts of Delaware and are subject to

Delaware's three year statute of limitations for breach of contract claims.[74]

> **2.    The 2010 Letter constituted a total breach of the Settlement Agreement which triggered the analogous statute of limitations**

The parties intensely disagree about when the statute of limitations for the

breach of contract claim began to run.[75]   The parties also ardently contest whether

the Settlement Agreement constitutes an installment contract.  I need not determine

whether the Settlement Agreement is an installment contract because Meso's actions

---

[72]    Quinn Aff. Ex. 50, at 14 (emphasis added).

[73]    *Id*. at 12-13.

[74]    10 *Del. C.* § 8106(a).

[75]    While statutes of limitations are not binding in courts of equity, when a plaintiff seeks a legal remedy for a legal claim in the Court of Chancery the statute of limitations will apply by analogy strictly to avoid placing the plaintiff in a better position than she would be had she gone to a Delaware court of law.  *Kraft v. WisdomTree Invs., Inc*., 145 A.3d 969, 975 (Del. Ch. 2016).  I address this issue in greater detail below.

19

constituted a total breach, which I hold triggers the statute of limitations even for an installment contract.

Delaware law is silent as to whether there can be a total breach of an installment contract such that the non-breaching party can recover on the entire contract, and the statute of limitations begins to run for the entire claim as opposed to just for the one installment. BioVeris relies on *Walpole v. Walls*[76] to argue that this Court should hold the breach of each installment of a contract gives rise to a new cause of action and triggers the limitations period anew as to that particular installment.[77] In *Walpole*, the plaintiff and defendant were joint owners of a convenience store.[78] In 1989, they entered into an oral agreement whereby the defendant acquired the plaintiff's ownership interest in the joint business by agreeing to pay off the plaintiff's second mortgage.[79] In January 1998, the defendant informed the plaintiff he was going to stop making payments on the mortgage.[80] The

---

[76]    2003 WL 22931330 (Del. Ct. C.P. July 8, 2003).

[77]    Opp'n Br. 30-31.

[78]    *Walpole*, 2003 WL 22931330, at *1.

[79]    *Id.*

[80]    *Id.*

defendant made his last payment on April 28, 1998.[81]  The plaintiff resumed payments on December 2, 1998.[82]  On October 28, 2001, the plaintiff filed suit to recover the payments he made on the mortgage after December 1998.[83]  The Court of Common Pleas recited the Delaware rule, "limitations on lawsuits for breach of installment payment contracts accrue with respect to each installment only from the time the installment becomes due, unless the obligee has the option to declare the whole sum due and exercises that option . . . ."[84]  Relying on this rule, and the fact that the parties did not include an acceleration clause in the oral agreement, the Court of Common Pleas allowed the plaintiff to recover all payments of the mortgage that would have been due within three years of filing suit.[85]

But the present case is distinguishable from *Walpole*.  In *Walpole*, the defendant told the plaintiff he was going to stop payments on the second mortgage.[86]

---

[81]    *Id.*

[82]    *Id.*

[83]    *Id.*

[84]    *Id.* at *2 (citing *Worrel v. Farmers Bank of the State of Del.*, 430 A.2d 469, 476 (Del. 1981)).

[85]    *Id.*

[86]    *Id.* at *1, *2.

That statement was an anticipatory repudiation.[87] In the case of an anticipatory repudiation the non-breaching party is entitled to a choice of several different types of remedy, including waiting until performance is due to pursue its claims.[88] But, an anticipatory repudiation can be retracted before the non-repudiating party has materially changed position in reliance on the repudiation.[89] In *Walpole*, the defendant continued to pay the mortgage after he told the plaintiff he was going to stop payments, but before the plaintiff started making the payments himself.[90] By

---

[87]    23 *Williston on Contracts* § 63:28 (4th ed.) (defining an anticipatory breach as "a repudiation of the obligations of a contract by a party to it before the time has come for performance on his or her part").

[88]    23 *Williston on Contracts* § 63:33 (4th ed.) ("Unquestionably the great weight of authority, whether rightly or wrongly decided, accepts the doctrine of breach by anticipatory repudiation or 'anticipatory breach.' Under the doctrine, as accepted by the courts, the rights of a party to a bilateral contract which has been anticipatorily breached should be: 1. to rescind the contract altogether, and if any performance has already been rendered by the injured party, to recover its value on principles of quasi contract; 2. to elect to treat the repudiation as a breach, either by bringing suit promptly, or by making some change of position; or 3. to await the time for performance of the contract and bring suit after that time has arrived.")

[89]    *Carteret Bancorp, Inc. v. Home Grp., Inc.*, 1988 WL 3010, at *6 (Del. Ch. Jan. 13, 1988) ("Thus, when effective, a retraction has the effect of nullifying a repudiation and placing the matter in its original position. . . . If the promise to whom a repudiation has been given relies upon it in any respect to his detriment . . . the promisor will lose the power to retract the repudiation for, in such circumstances, his retraction cannot really return the situation to its prior status.").

[90]    *See Walpole*, 2003 WL 22931330, at *1 (The defendant told the plaintiff "he would no longer make payments" in January 1998, but the defendant made his last payment on April 28, 1998.).

22

continuing to pay the mortgage the defendant effectively retracted his repudiation.[91]

Thus, the defendant's failure to pay after April 1998 was a breach of an installment contract by non-performance, which is consistent with the court's statement of the Delaware rule, other Delaware case law cited by BioVeris,[92] and the court's holding in *Walpole*.

The present case, however, presents a scenario on which Delaware law largely remains silent. In contrast to a bare anticipatory repudiation, significant authority supports the conclusion that a repudiation coupled with simultaneous non-performance gives rise to an action for total breach, allowing the non-breaching party to bring an action for the entire contract price and triggering the statute of limitations as to the total amount due under the contract.

Section 243(2) of Restatement (Second) Contracts states "[e]xcept as stated in Subsection (3), a breach by non-performance accompanied by or followed by a

---

[91]   *See* Restatement (Second) of Contracts § 256 cmt. b (1981) ("It is not necessary for the repudiator to use words in order to retract his statement.").

[92]   *Worrel v. Farmers Bank of the State of Del.*, 430 A.2d 469, 471 (Del. 1981) (discussing a breach by non-payment with no repudiation); *Knutkowski v. Cross*, 2014 WL 5106095, at *1 (Del. Ch. Oct. 13, 2014) (discussing a breach by non-payment with no repudiation).

repudiation gives rise to a claim for damages for total breach."[93]  *Williston on*

*Contracts* states,

> In the case of a strictly anticipatory breach, it is true, there is often at least a theoretical possibility that the repudiator can and will effectively withdraw the repudiation so that the contract can be performed, but after a material present breach, any attempt to withdrawal by the wrongdoer would be ineffectual.  . . . The idea that the injured party may elect not to call a breach something that is a breach . . . is not logically defensible, whatever authorities may be cited in its favor.[94]

*Corbin on Contracts* states a similar view:

> Suppose next that the contract requires performance in installments or continuously for some period and that there has been such a partial failure of performance as justifies immediate action for a partial breach.  If this partial breach is accompanied by repudiation of the contractual obligation such repudiation is anticipatory with respect to the performances that are not yet due.  In most cases, the repudiator is now regarded as having committed a "total" breach, justifying immediate action for the remedies appropriate thereto.  . . . The non-performance plus the repudiation constitute one and only one cause of action.[95]

---

[93]  Restatement (Second) of Contracts § 243(2) (1981).

[94]  31 *Williston on Contracts* § 79:19 (4th ed.).

[95]  9 Arthur Linton Corbin *Corbin on Contracts* § 954 (interim ed. 2002) (citations omitted); 10 John E. Murray, Jr. *Corbin on Contracts* § 53.12 (Joseph M. Perillo, ed., rev. ed. 2014) (citations omitted).

The Court of Appeals for the Third Circuit summarized the above section from *Corbin on Contracts* stating, "[a] single infraction of contractual obligations, such as a missed payment, is insufficient to constitute a 'total breach' of the agreement *unless* accompanied by an anticipatory repudiation of future performance."[96] I agree with this authority and hold that a present breach of an executory contract coupled with a repudiation of the remainder of the contract constitutes a total breach, which allows the non-breaching party to recover everything owed under the contract and triggers the statute of limitations for the entire contract.

Under BioVeris's own theory of the case, Defendants breached the Settlement Agreement on May 28, 2010 when they sent payment for less than half of the amount required under Section 8.5.3. The breach was apparent on the face of the accompanying letter, which reported aggregate Diagnostics Net Sales of $17,452,585.[97] Under Section 8.5.3, the quarterly payment to BioVeris should be

---

[96] *R.C. Beeson, Inc. v. Coca Cola Co.*, 337 F. App'x 241, 244 (3d Cir. 2009) (emphasis added) (citations omitted) (citing 9 *Corbin on Contracts* § 954). The Third Circuit was sitting in diversity and applying New Jersey law in *R.C. Beeson*. Prior to the extension of New Jersey law in *R.C. Beeson*, New Jersey and Delaware law were consistent on this topic. Therefore, extending Delaware law in the same manner is consistent with the weight of authority and supported by the *R.C. Beeson* decision.

[97] Ross Aff. Ex. 26, at MSD-0011090.

25

five percent, or $872,629.  Instead, Meso paid $430,670, a clear breach of the parties' agreement.[98]

The parties, however, disagree on whether Meso repudiated the remainder of the contract with the 2010 Letter.  The policy rationale for recognizing the doctrine of anticipatory breach was articulated by Chancellor Allen in *Carteret Bancorp, Inc. v. Home Group, Inc.*[99]  "If it is clear that the promisor intends not to perform his promise, there seems little reason to force the parties to wait to have their rights and obligations determined while markets rise and fall and practical adjustments to the new state of affairs could be made."[100]  To find that there has been an anticipatory repudiation, "a promisor must give an 'unequivocal statement' that is 'positive and unconditional.'"[101]

BioVeris relies on *Veloric v. J.G. Wentworth Inc.*[102] to argue that the 2010 Letter was not a repudiation.  This reliance is erroneous.  In *Veloric*, this Court examined four statements the plaintiffs argued constituted anticipatory repudiations.

---

[98]    *Id.*

[99]    *Carteret Bancorp, Inc.*, 1988 WL 3010, at \*5.

[100]   *Id.*

[101]   *Veloric v. J.G. Wentworth Inc.*, 2014 WL 4639217, at \*15 (Del. Ch. Sept. 8, 2014).

[102]   *Veloric,* 2014 WL 4639217.

This Court found that each was only an expression of belief or doubt and, therefore, not unequivocal.[103] Meso's statement in the 2010 Letter that the payment "represents the remaining balance due on the Purchase Price (including accrued interest)" is positive, unequivocal, and unconditional. It made clear that Meso would be sending no further payments, which BioVeris believed, and still believes, it was owed. Furthermore, BioVeris's internal documents show that BioVeris understood the 2010 Letter was a repudiation of the Settlement Agreement.[104] There can be no question, then, that the 2010 letter constituted an anticipatory repudiation.

BioVeris argues that even if the 2010 Letter and payment were a breach and repudiation, the exception in Restatement Section 243(3) applies. Section 243(3) provides:

> Where at the time of the breach the only remaining duties of performance are those of the party in breach and are for the payment of money in installments not related to one another, his breach by non-performance as to less than the whole whether or not accompanied or followed by a repudiation, does not give rise to a claim for damages for total breach.[105]

---

[103] *Id.* at *15 (stating, for example, "[p]laintiffs allege that defendant Rodriguez told Veloric in a November 1, 2012 email … that Wentworth 'had no assets with which it could pay Veloric and Goodman, and that [d]efendants believed no other Wentworth entity owed any obligation relating to the TRA'").

[104] Ross Aff. Exs. 133, 134 ("[Diagnostics] is claiming they have paid the note in full. Currently being handled by lawyers.").

[105] Restatement (Second) of Contracts § 243(3) (1981).

27

It is uncontested that the parties' never completed the Pro Rata Rent Share reconciliation process as required under the Settlement Agreement.[106] Instead, BioVeris argues that Meso prevented the reconciliation, and therefore, the exception from Section 243(3) should still apply.[107] BioVeris cites no legal authority to support this assertion.[108] BioVeris also argues that absent a reconciliation, an estimate for the Pro Rata Rent Share would be used to reconcile the Pro Rata Rent Share.[109] Again, BioVeris offers no authority or facts to support this assertion.[110] The bottom line then is that BioVeris concedes that the parties never came to an agreement on the Pro Rata Rent Share reconciliation as required by the Settlement Agreement.

Because the parties still have not fulfilled their duty to reconcile the Pro Rata Rent Share, the Settlement Agreement is still executory and does not fall under the

---

[106] Oral Arg. Tr. 37-38.

[107] *Id.* at 38.

[108] *Id.*

[109] Oral Arg. Tr. 68.

[110] Because BioVeris has offered no facts to support its arguments or assertions it has not created a triable issue of material fact that would preclude the granting of summary judgement. *Leitstein v. Hirt*, 2006 WL 2986999, at *1 (Del. Ch. Oct. 12, 2006) (quoting *McGowan v. Ferro*, 859 A.2d 1012, 1027 (Del. Ch. 2004), aff'd 873 A.2d 1099 (Del. 2005)) ("The non-moving party does bear one burden: 'In the face of a properly supported motion for summary judgment, the nonmoving party must produce evidence that creates a triable issue of fact or suffer the entry of summary judgment against it.'").

28

exception in Section 243(3).  Meso's 2010 Letter with accompanying payment was a present breach accompanied by an anticipatory repudiation, constituting a total breach.  A total breach triggers the statute of limitations, which in Delaware is three years for a breach of contract claim, for the entire contract.[111]  BioVeris, therefore, had until May 28, 2013 to bring its action for breach of contract in the courts of Delaware.

### 3. No tolling doctrines, unusual conditions, or extraordinary circumstances apply in this case

A plaintiff with a legal claim seeking legal damages in the Court of Chancery cannot avoid the statute of limitations that would apply in a Delaware court of law by invoking the equitable doctrine of laches.[112]  To avoid allowing a plaintiff to benefit from the more flexible doctrine of laches "an analogous limitations period should operate as a strong presumption of laches for cases in this Court's concurrent jurisdiction, which generally will obviate the need for a traditional laches inquiry. The presumption is rebuttable, however, either by a recognized tolling doctrine or by the presence of extraordinary circumstances."[113]  BioVeris seeks monetary damages for a breach of contract and, thus, has brought a legal claim seeking legal

---

[111]    10 *Del. C.* § 8106(a).

[112]    *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 976 (Del. Ch. 2016).

[113]    *Id.* at 982-83.

relief. Therefore, there is a strong presumption laches applies unless BioVeris rebuts the presumption by showing unusual conditions or exceptional circumstances under *IAC/InterActiveCorp v. O'Brien*.[114]

In *O'Brien*, the Delaware Supreme Court affirmed the following factors to determine whether "unusual conditions or exceptional circumstances" justify ignoring the analogous statute of limitations:

> 1) whether the plaintiff had been pursuing his claim, through litigation or otherwise, before the statute of limitations expired; 2) whether the delay in filing suit was attributable to a material and unforeseeable change in the parties' personal or financial circumstances; 3) whether the delay in filing suit was attributable to a legal determination in another jurisdiction; 4) the extent to which the defendant was aware of, or participated in, any prior proceedings; and 5) whether, at the time the litigation was filed, there was a bona fide dispute as to the validity of the claim.[115]

BioVeris argues unusual conditions or exceptional circumstances exist here because BioVeris pursued its claims under the dispute resolution provisions of the JVA before the statute of limitations expired, and the parties had a bona fide dispute about the claims at the time this litigation was filed.[116] Additionally, BioVeris

---

[114]  26 A.3d 174 (Del. 2011).

[115]  *Id.* at 178.

[116]  Opp'n Br. 45-46

contends that initiating negotiations under Section 7.2 of the JVA tolled the statute of limitations. None of these arguments save these claims.

Instituting negotiations on May 28, 2013 was not sufficient pursuit of the claims to qualify under the first *O'Brien* factor. BioVeris points to two cases where Delaware courts have examined the pursuit of claims under *O'Brien*: *Levey v. Brownstone Asset Management, LP* and *Perlman v. Vox Media, Inc.*[117] In *Levey*, the Delaware Supreme Court found the plaintiff had sufficiently pursued his claim "by litigation or otherwise."[118] That case involved significant confusion over the proper forum for the dispute, but the plaintiff diligently attempted to find the correct forum. Before the running of the analogous statute of limitations, the plaintiff had taken the following steps: First, he raised his claims as compulsory counterclaims to a lawsuit in the Southern District of New York.[119] Then, he sent a letter to the defendants demanding payment.[120] Finally, he requested the Southern District of New York compel arbitration before the National Association of Securities Dealers ("NASD")

---

[117]    76 A.3d 764 (Del. 2013); 2015 WL 5724838 (Del. Ch. Sept. 30, 2015).

[118]    76 A.3d 764, 771 (Del. 2013).

[119]    *Id.* at 766.

[120]    *Id.* at 766-67.

and stay the case pending the outcome of the arbitartion.[121] The Southern District of New York granted the motion to compel and ordered the case closed.[122] The plaintiff complied with the order and filed a demand for arbitration with the Financial Industry Regulatory Authority, Inc. ("FINRA"), the successor to NASD.[123] The FINRA arbitration panel found that they did not have jurisdiction over the defendants and "advised [the plaintiff] to pursue his claims 'in another forum which does have jurisdiction' over the [d]efendants."[124] It was only after the arbitration was dismissed that the plaintiff filed in Delaware, but by that point the analogous statute of limitations had run.[125]

In *Perlman*, this Court found the plaintiffs had pursued their claims when they "spent time, effort, and money calling websites around the world that were republishing the 2012 Articles, bring[ing] to their attention the defamation therein and requesting they remove the links."[126] This Court found the plaintiff's diligence

---

[121] *Id.* at 767.

[122] *Id.*

[123] *Id.*

[124] *Id.*

[125] *Id.*

[126] 2015 WL 5724838, at *13 (Del. Ch. Sept. 30, 2015).

to qualify under the first *O'Brien* factor for two reasons. First, the pursuit was "self-help rather than litigation," which showed the plaintiffs were trying to avoid "running to the courthouse" and were attempting to deal with the dispute without burdening any court.[127] Second, the plaintiffs argued that they did not understand the true extent of their harm until after the statute of limitations had run.[128]

In contrast to these two examples, BioVeris merely sent two letters before the statute of limitations expired. The April 30, 2013 letter demanded payment two years and eleven months after Meso stopped payments. The May 28, 2013 letter purported to open negotiations under the JVA, obviously disregarding the parties' forum selection clause in the Settlement Agreement. These two letters do not rise anywhere near the same level of diligence exercised by the plaintiffs in *Levey* and *Pearlman*, and they do not show BioVeris was pursuing the claim before the statute of limitations expired. This is especially true since there was a clear forum selection clause in the Settlement Agreement.[129]

---

[127]     *Id.*

[128]     *Id.*

[129]     Quinn Aff. Ex. 50, at 12-13.

A party cannot rely on a suit knowingly filed in the wrong forum as a basis for avoiding the application of laches.[130] Section 7.2 of the JVA allowed for the tolling of the statute of limitations until the dispute was resolved under the arbitration agreement as long as an arbitration request was filed within sixty days of the termination of the good faith negotiations.[131] But, Section 7.2 of the JVA does not apply to these claims. Therefore, the tolling provision in Section 7.2 does not save these claims. BioVeris chose to disregard Section 34 of the Settlement Agreement, which required it to bring these claims in Delaware courts. Thus, BioVeris cannot save its claims with the arbitration action under the first *O'Brien* factor.[132] If BioVeris wished to pursue claims under the Settlement Agreement and the JVA, then it should have filed two different actions in the two appropriate forums.

BioVeris makes no argument, nor advances any facts, as to the second, third, or fourth *O'Brien* factors. As for the fifth *O'Brien* factor, BioVeris argues that there was a bona fide dispute at the time the suit was filed. The mere existence of a bona fide dispute at the time the suit was filed does not justify a finding of extraordinary circumstances when the weight of the other factors cuts against such a finding. Thus,

---

[130]   *Carlyle Inv. Mgmt. L.L.C. v. Nat'l Indus. Gp. (Hldg.)*, 2012 WL 4847089, at *11 (Del. Ch. Oct. 11, 2012), *aff'd* 67 A.3d 373 (Del. 2013); *CMS Inv. Hldg., LLC v. Castle*, 2016 WL 4411328, at *3 (Del. Ch. Aug. 19, 2016).

[131]   Ross Aff. Ex. 2, at 24.

[132]   *Id.*

34

I do not find that extraordinary circumstances existed such that laches should not bar the claim.

Because there was no extraordinary circumstance nor tolling under the contract, the applicable statute of limitations applies strictly by analogy. The total breach of the Settlement Agreement took place on May 28, 2010.[133] BioVeris, therefore, had until May 28, 2013 to file its claims in the Delaware courts under the analogous three-year statute of limitations for breach of contract claims.[134] BioVeris did not file this action until June 28, 2013; thus, the action is time barred.[135]

## B. The Parties Fail to Address the Relief Plaintiff Seeks Under Section 8.5.6 of the JVA

BioVeris also requests two forms of relief it contends are available under Section 8.5.6 of the JVA. First, BioVeris requests $463,316 to be added to the Purchase Price (before the interest calculation) as the fifteen percent penalty under Section 8.5.6(b).[136] Second, BioVeris asks for "[a]n order requiring the appointment to the Board of Managers of [Diagnostics] of one person designated by BioVeris to

---

[133] *Supra* section II.A.2.

[134] 10 *Del. C.* § 8106(a).

[135] Compl. 9.

[136] Compl. 2; Oral Arg. Tr. 45.

serve as a member of the Board of Managers until payment in full is made, pursuant to [Section] 8.5.6(a) of the JVA."[137]

The Settlement Agreement "constitutes the entire agreement among the parties with respect to the subject matter thereof."[138] The subject matter of the Settlement Agreement appears to be the buyout process and the dependent provisions. Thus, the Settlement Agreement seemingly superseded Sections 8.5.5 and 8.5.6. The parties, however, failed to address how the Settlement Agreement effects the availability of these remedies from the JVA. Furthermore, neither party addressed which dispute resolution provision would govern these claims or performed any analysis pertaining to the statute of limitations or laches for these claims. Therefore, the Court reserves judgement on this issue pending supplemental briefing from the parties.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED in part and RESERVED in part. The parties shall submit supplemental briefing to address the issues identified in section II.B. above. The trial scheduled for November 13-15, 2017 is cancelled.

**IT IS SO ORDERED**.

---

[137] Compl. 2; Oral Arg. Tr. 45.

[138] Quinn Aff. Ex. 50, ¶ 45.